PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2888
_____

UNITED STATES OF AMERICA

v.

MALIK NASIR,

                              Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-16-cr-0015-01)
District Judge:  Hon. Leonard P. Stark

_____

Argued on November 12, 2019 before Merits Panel
Argued En Banc on June 24, 2020

Remanded by the Supreme Court of the United States
On October 4, 2021
Submitted on Remand (November 5, 2021)

Before: SMITH, *Chief Judge*, McKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
SHWARTZ, KRAUSE, RESTREPO, BIBAS, PORTER,
MATEY, PHIPPS, SCIRICA,* and RENDELL,* *Circuit
Judges.*

(Filed: November 8, 2021)

_____

Keith M. Donoghue    [ARGUED]
Brett G. Sweitzer
Federal Community Defender Office
  For the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center – Suite 540 West
Philadelphia, PA   19106
        *Counsel for Appellant*

Whitney C. Cloud   [ARGUED]
Robert F. Kravetz   [ARGUED]
Daniel E. Logan, Jr.
Office of United States Attorney
1313 North Market Street
Hercules Bldg. – Ste. 400
Wilmington, DE   19801
        *Counsel for Appellee*

_____

* Judges Scirica and Rendell have elected to participate
as members of the en banc court pursuant to Third Circuit
I.O.P. 9.6.4.

Ilya Shapiro
Cato Institute
1000 Massachusetts Avenue, NW
Washington, DC  20001
        *Counsel for Amicus Cato Institute*

Jared McClain
New Civil Liberties Alliance
1225 19th Street, NW – Suite 450
Washington, DC   20036
        *Counsel for Amicus New Civil Liberties Alliance*

Evan A. Young
Baker Botts
98 San Jacinto Boulevard – Suite 1500
Austin, TX   78701
        *Counsel for National Association of Home Builders,*
        *American Farm Bureau Federation,*
        *National Cattlemens Beef Association, and*
        *National Mining Association*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge*.

On a tip, Malik Nasir was arrested near a storage unit in which he kept the marijuana he was selling.  He was subsequently charged with, and convicted of, two drug offenses and a firearm offense.  At sentencing, the District Court applied a career offender enhancement found in the United States Sentencing Guidelines (the "guidelines").  Nasir

appealed his convictions and challenged the application of that enhancement. For the reasons that follow, we reject the challenge to his convictions and reiterate that the sentencing enhancement was not properly applied.[1] We will therefore

[1] This is not our first effort to address Nasir's appeal. A panel of the Court heard argument from the parties on November 12, 2019. We then sua sponte determined to rehear the case en banc. While several issues were to be decided, we focused our en banc attention on two questions in particular: first, whether the career offender enhancement was properly applied, and, second, whether his firearms conviction could be upheld after the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019). We were unanimous in deciding the first issue in the negative, and, though closely divided on the second issue, we concluded that the firearms conviction could not stand. We thus vacated Nasir's conviction as a felon in possession of a firearm and remanded for a new trial on that charge, as well as for resentencing on the remaining counts of conviction. *United States v. Nasir*, 982 F.3d 144, 150 (3d Cir. 2020), *cert. granted, judgment vacated*, No. 20-1522, 2021 WL 4507560 (U.S. Oct. 4, 2021). The government then sought a writ of certiorari. Following oral argument in a pair of different cases, *Greer v. United States* and *United States v. Gary*, 141 S. Ct. 2090 (2021) (hereinafter "*Greer*"), the Supreme Court issued a decision contrary to the view we had taken of *Rehaif*. *See Greer*, 141 S. Ct. at 2096. ("The question for this Court is whether Greer and Gary are entitled to plain-error relief for their unpreserved *Rehaif* claims. We conclude that they are not."). Consequently, the Court granted the government's petition for certiorari in this case, vacated the judgment, and remanded for further consideration in light of *Greer*. *United States v. Nasir*,

affirm Nasir's convictions, vacate his sentence, and remand for resentencing.

## I. BACKGROUND

On December 21, 2015, the owner of a storage facility in Dover, Delaware reported to the police suspicious activity at one of the storage units, number C69. The owner asked the police to visit the storage facility to discuss what he believed to be "drug occurrences" on his property. (App. at 90.) When the police arrived, he told them that, over the past several months, someone had visited that unit frequently, as often as five times a day. Each time, the man – whom he identified as Nasir – would enter the storage unit and close the door behind him. Shortly thereafter, he would reemerge and leave the facility. Concerned about illegal activity, the owner had taken a photograph of the inside of the unit, which he showed the officers. It revealed two large coolers, two closed buckets, a box of baggies, a large bag, and an aerosol spray can. The owner provided a copy of a rental agreement signed by Nasir and a photocopy of Nasir's driver's license. The rental agreement listed Nasir's storage unit as C43, not C69, but the police apparently did not notice that discrepancy.[2]

---

No. 20-1522, 2021 WL 4507560 (U.S. Oct. 4, 2021). This is our decision on remand. The sentencing-enhancement ruling reflects the decision of the Court en banc. The remaining issues are the decision of the original panel, consisting of Judges Jordan, Scirica, and Rendell.

[2] Nasir had initially agreed to rent unit C43, but soon after transferred to unit C69.

Following up on the information provided by the facility owner, the police ran a criminal history check on Nasir and learned that he had a criminal record that included felony drug convictions. They visited unit C69 with a drug detection dog, and the dog positively alerted to the presence of drugs there. Based on the accumulated evidence, the detectives applied for a search warrant for that unit.

While awaiting the warrant, several police officers remained at the storage unit, and one surveilled Nasir's home. The officer at the home saw Nasir place a large black bag in the back of a Mercury Mariner SUV and drive in the direction of the storage facility. Nasir in fact went to the facility, and, when he arrived, the officers stopped him as he entered the row of units including numbers C69 and C43. After handcuffing him and putting him in the back of a patrol car, they searched his SUV, where they found a black duffle bag and a key to unit C69.

That same night, a search warrant issued and was executed. In unit C69, the police found more than three kilograms of marijuana, as well as scales and packaging materials. The next day, they applied for and received a search warrant for Nasir's home and any vehicles on the property. While executing the warrant, the officers found $5,000 in cash in a grocery bag in the house and several handguns with ammunition in a Dodge Charger parked on the property.

Nasir was indicted for violating 21 U.S.C. § 856(a)(1), part of what is commonly known as the crack house statute (Count One), and was also charged under 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) for possession of marijuana with intent to distribute (Count Two), and under 18

6

U.S.C. §§ 922(g)(1) and 924(a)(2) as a felon in possession of a firearm (Count Three). He moved to suppress the evidence obtained from the searches of the storage unit, his house, and his vehicles. The District Court held hearings on that motion and denied it. Later, at trial, the jury convicted him on all three counts of the indictment.

After the trial, Nasir filed a motion to set aside the verdict and a motion for a new trial, both of which were denied. The District Court sentenced him to 210 months of imprisonment and three years of supervised release, having determined that he qualified as a career offender under the guidelines because of two earlier convictions in Virginia, one from the year 2000 for attempting to possess cocaine with intent to distribute and one from 2001 for possession of cocaine and marijuana. This appeal followed.

## II.    DISCUSSION[3]

This appeal now presents four issues.[4] First, Nasir says that there was insufficient evidence to sustain his conviction

___

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

[4] As noted earlier, *supra* n.1, Nasir had also argued that, under *Rehaif*, 139 S. Ct. at 2194, to sustain a conviction under 18 U.S.C. § 922(g), the government had to prove he knew he was a felon, that it had failed to do so, and that it was plain error for him to be convicted in the absence of such proof. That line of argument was struck down by the Supreme Court in *Greer*, 141 S. Ct. at 2096, and requires no further discussion.

under the crack house statute because the section of the statute under which he was convicted does not make it unlawful to store drugs. Second, he argues that the officer who searched the Mercury Mariner did not have probable cause to justify that search, so the evidence found there should have been suppressed. Third, he contends that a member of his jury was avowedly partial, so seating her deprived him of a fair trial. Fourth, he asserts that the career-offender enhancement under the guidelines should not have factored into his sentencing because one of his prior felony convictions does not qualify as a "controlled substance offense," as that term is defined in the guidelines.

We will affirm the District Court's denial of Nasir's motion for acquittal as to Counts 1 and 2 and accordingly affirm those convictions. In doing so, we reject Nasir's first three arguments. However, we agree that he does not qualify for the career-offender enhancement and must be resentenced.

### A.   The Crack House Conviction

Nasir first challenges his conviction under the crack house statute, specifically 21 U.S.C. § 856(a)(1), which makes

---

The judgment order we enter today accordingly reflects that all of Nasir's convictions, including his conviction under § 922(g), are affirmed. Because the Supreme Court vacated our earlier judgment in its entirety, however, we reiterate our analysis of the four issues that were not implicated by *Greer*, and our judgment order will also reflect the conclusions we repeat here.

8

it unlawful to "knowingly … lease, rent, use, or maintain any place … for the purpose of manufacturing, distributing, or using any controlled substance." Despite the breadth of that language, Nasir argues that his conviction should be reversed because, he says, that subsection was not meant to cover storage.[5] Nasir did not preserve that argument in the District Court, so we review the denial of his motion for judgment of acquittal for plain error.[6] *United States v. Olano*, 507 U.S. 725, 731 (1993). We will reverse for plain error only if there was an actual error that is plain, that affects "the outcome of the district court proceedings," and that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 734-36 (citations and internal quotation marks omitted) (alteration in original).

---

[5] Nasir does not argue that 21 U.S.C. § 856(a)(1) does not cover storage units; instead, he says that it does not cover the activity of storing. The distinction he attempts to draw is irrelevant here because, as we will explain, there was ample evidence to support the finding that Nasir was not merely storing drugs, he was distributing drugs from a rented place.

[6] Nasir claims he preserved his position when he raised a sufficiency-of-the-evidence challenge. At trial, Nasir's attorney said, "[s]uccinctly, it's our position that the government has not proved Mr. Nasir in possession of either the firearms or the marijuana." (App. at 549.) But counsel's generic statement, which made no reference to 21 U.S.C. § 856, was not sufficient to preserve a claim of error on this issue.

Nasir's argument rests on the contrast between subsection (a)(1) of the crack house statute, which he was convicted of violating, and subsection (a)(2), under which he was not charged. That latter subsection declares it unlawful to "manage or control any place, whether permanently or temporarily, … and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, *storing*, distributing, or using a controlled substance." 21 U.S.C. § 856(a)(2) (emphasis added).

According to Nasir, because "storing" is listed as a prohibited activity in subsection (a)(2) but is not mentioned in subsection (a)(1), it was intentionally excluded from (a)(1). By his lights, since he was storing illegal drugs, he should be safe from conviction under (a)(1). But even if we were inclined to accept that subsection (a)(1) does not cover storage, that does not help Nasir. No sensible reading of the statute allows one to distribute drugs just because one is also storing them. Within unit C69, besides the drugs themselves, there was drug distribution paraphernalia, namely scales and packaging materials such as food storage bags. In addition to that evidence, there was the testimony of the facility owner about Nasir's frequent and suspicious trips to the unit. Subsection (a)(1) expressly prohibits "distributing" a controlled substance from any rented place, and the jury was presented with more than ample evidence that Nasir was doing just that. The District Court properly instructed the jury that it could find Nasir guilty of violating section 856(a)(1) if he used a "place for the purpose of manufacturing, *distributing*, or using any controlled substance." (App. at 615 (emphasis added).) There was thus an obvious and legitimate basis for his conviction under the crack house statute, and the District Court's denial of

10

Nasir's motion for a judgment of acquittal was not error at all, let alone plain error.

### B. The Motion to Suppress Evidence from the SUV

Nasir also appeals the denial of his motion to suppress the evidence retrieved in the search of his Mercury Mariner SUV. He repeats the argument he made in the District Court, saying that the officer who searched the SUV lacked probable cause. We review *de novo* whether there was probable cause to justify police action. *United States v. Vasquez-Algarin*, 821 F.3d 467, 471 (3d Cir. 2016).

The legal theories offered in opposition to and support of the SUV search have morphed over time. They began with Nasir objecting to the search as the proverbial fruit of the poisonous tree. He said the "[p]olice did not have cause to arrest [him] at the time he arrived at the storage facility parking lot and accordingly all statements made by him and any evidence found subsequent to his arrest should be suppressed." (App. at 47.) In responding to that motion, the government said that the search of the SUV "was a lawful search incident to a valid arrest pursuant to *Arizona v. Gant*, 556 U.S. 332 (2009)." (App. at 60 n.21.) The government also stated that, at the suppression hearing, it "would present evidence that the search … was a valid inventory search[,]" although apparently it did not do so. (App. at 60 n.21.) In his post-hearing rebuttal briefing before the District Court, Nasir argued that the search of the SUV was unlawful as a search incident to arrest and as an inventory search. The District Court ultimately classified the search as being incident to Nasir's arrest but noted that, even if the search had occurred prior to the arrest, "the search

11

of the vehicle appears to have been within the scope of the automobile exception" to the warrant requirement of the Fourth Amendment. (App. at 21 n.4 (citations omitted).)

On appeal, Nasir simply asserts, without specifying the legal framework for analysis, that there was no probable cause to search the SUV.[7] We conclude that the District Court correctly approached the issue as being a search incident to arrest. Even when, like Nasir, an arrestee is detained and not within reach of his vehicle, the police may conduct "a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (citation and internal quotation marks omitted). Whether viewed as a question of probable cause to arrest Nasir or probable cause to search the SUV under the automobile exception, however, the pertinent facts and the outcome are the same.

In challenging the search of the SUV, Nasir says that the evidence uncovered in that vehicle – a black duffle bag and the key to unit C69 – should have been suppressed because the investigating officers did not corroborate the tip from the storage facility owner. Nasir characterizes the owner as an unknown and unreliable informant, and he lays particular emphasis on the incorrect unit number on the rental agreement the owner provided to the police. Nasir also argues that the

---

[7] Although Nasir pointed out in his briefing that the arresting officer said he "[b]asically … looked at [the search] as an inventory search," (App. at 138,) that does not appear to have been the theory that the government pursued before the District Court or now pursues on appeal.

District Court impermissibly attributed information known only to officers not present at the search to the officer who actually conducted the search. His arguments are unpersuasive.

When the police receive information from an informant for the first time, they have a duty to independently corroborate at least some of the information the informant provides. *See Illinois v. Gates*, 462 U.S. 213, 242 (1983) ("[A]n officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." (citation and internal quotation marks omitted)). They discharged that duty in this case. The arresting officers personally knew the following at the time of the arrest and related search of the vehicle: according to a background check, Nasir had a history of drug dealing; the owner of the storage facility had reported Nasir engaged in suspicious activity at unit C69, including making numerous trips to the storage unit, sometimes several in a day; the owner had taken a photograph that showed items in the unit consistent with drug distribution; an officer had seen Nasir put a bag in the back of his car and drive toward the storage facility; and a narcotics dog had positively alerted to drugs at unit C69.

Given the totality of those circumstances known to the officers who arrested Nasir, there was certainly probable cause, reasonably corroborated, for Nasir's arrest, and it was reasonable to believe that evidence of his drug dealing would

13

be found in the SUV.[8]  We will therefore affirm the District Court's denial of Nasir's motion to suppress.

## C.    The Ruling on Alleged Juror Bias

Nasir next claims that he was deprived of a fair and impartial jury because one of the jurors at his trial, Juror 27, did not unequivocally affirm that she would be impartial.  Our review of a ruling on a motion to strike a juror for cause is for manifest error – a most deferential standard.  *Skilling v. United States*, 561 U.S. 358, 396 (2010).  The Supreme Court has emphasized that jury selection is "particularly within the province of the trial judge" and cautioned against "second-guessing the trial judge's estimation of a juror's impartiality[.]" *Id.* at 386 (citation and internal quotation marks omitted).

During voir dire, one of the questions the District Court asked to determine juror partiality was, "Would you give more or less weight to the testimony of a law enforcement agent or police officer than you would give to that of a civilian witness,

---

[8] We note, as did the District Court, that even if the search had been performed prior to Nasir's arrest, "the search of the vehicle appears to have been within the scope of the automobile exception." (App. at 21 n.4 (citations omitted).)  It is well established that under the automobile exception to the warrant requirement, the police may search a vehicle if they have probable cause to believe that the vehicle contains evidence of criminal activity.  *Carroll v. United States*, 267 U.S. 132, 155-56 (1925).  Here, the same facts that gave rise to probable cause for an arrest can rightly be seen as independently giving rise to probable cause for a search of the vehicle.

simply because he or she is employed as a law enforcement agent or police officer?" (App. at 237-38.) Because Juror 27 answered "yes" to that question, the following colloquy ensued:

> A JUROR: […] But the other thing that I kind of answered "yes" to was police officer and a person on the street. I would like to think I would be partial (sic), but I don't know.
>
> THE COURT: You would like to think you would be impartial and fair to both sides?
>
> A JUROR: Yes, impartial that is what I would like to say.
>
> THE COURT: What is your concern you wouldn't be?
>
> A JUROR: Well, my daughter dates a state police officer. And I really have a lot of respect for them, you know, and I feel that for the most part they all do a good job, and they try to be fair. I think I might tend to believe what they say. I don't know.
>
> THE COURT: Do you think if I instruct you that you have to be fair and impartial and assess everybody's credibility as best as you can that you would be able to do that?
>
> A JUROR: I would think I would. I would hope I would.

(App. at 305.) Then, outside the juror's presence the Court and counsel had this further conversation:

15

[NASIR'S ATTORNEY]: Your Honor, I move to strike on the basis that she -- her daughter is dating a state police officer and she would tend to believe the officer and police testimony.

THE COURT: What is the government's position?

[GOVERNMENT'S ATTORNEY]: Your Honor, I don't have a real strong one. That she would answer any questions that she was instructed [sic]. She could stay impartial. She confronted all those issues. I certainly understand why [Defense counsel] is objecting.

THE COURT: Any response?

[NASIR'S ATTORNEY]: No response, Your Honor.

THE COURT: I'm going to deny the motion. I felt sufficient confidence that she would work as hard as anyone could to be fair and impartial, and I think she would follow the instructions. So I'm denying the motion to strike.

(App. at 306-07). Nasir argues that the statements "I would think I would" and "I would hope I would" are not sufficiently strong affirmations of impartiality.

Because the juror admitted to her concern about partiality, the District Court quite rightly asked follow-up questions to determine whether she was actually biased. *Cf. United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012) (holding that actual bias is "the existence of a state of mind that leads to an inference that the person will not act with entire

16

impartiality[,]" unlike implied bias, which is "presumed as [a] matter of law" (citations and internal quotation marks omitted)). Here, Juror 27's acknowledgement that she "ha[s] a lot of respect for" police officers and "might tend to believe what they say" prompted the District Court to emphasize her obligation to be fair and impartial and to weigh the evidence equally. (App. at 305.) She responded with assurances that she would follow the Court's instructions. Her declaration that she "would think" and "would hope" (App. at 305) that she could be impartial – combined, it seems, with the way in which she said it – allowed the District Court, observing her behavior and mannerisms first hand, to have "sufficient confidence that she would work as hard as anyone could to be fair and impartial." (App. at 306-07.) That decision, on this record, is not manifestly erroneous.

## D. The Career Offender Enhancement

Finally, Nasir challenges the enhancement he received at sentencing pursuant to the "career offender" provision of the sentencing guidelines. He argues that he should not have received the enhancement because one of his two prior qualifying convictions was an inchoate drug offense, which does not qualify as a predicate offense under the plain language of the guidelines. The interpretation of the guidelines is a legal question, so we exercise plenary review. *United States v. Wilson*, 880 F.3d 80, 83 (3d Cir. 2018). We agree with Nasir that the plain language of the guidelines does not include inchoate crimes, so he must be resentenced.

17

### 1. *The Definition of "Controlled Substance Offenses" in the Guidelines*

Under section 4B1.1 of the sentencing guidelines, an adult defendant is a career offender if "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and … the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). If a defendant is a career offender, that designation increases the offense level of the crime for which he is to be sentenced and mandates a criminal history ranking of Category VI. U.S.S.G. § 4B1.1(b).

The District Court determined that one of Nasir's three convictions in this case is a controlled substance offense, namely his conviction on Count Two for possession of marijuana with intent to distribute. After evaluating Nasir's criminal history, the Court concluded that two of his prior convictions in Virginia state court also qualify as predicate controlled substance offenses: a 2000 conviction for an attempt to possess with intent to distribute cocaine and a 2001 conviction for possession of marijuana and cocaine with intent to distribute.[9] Nasir was accordingly sentenced as a career offender.

He argues that his conviction in 2000 for attempting to possess with intent to distribute cocaine should not qualify as

---

[9] Nasir has other prior convictions, but the government and Nasir appear to agree than none of them qualify as predicate offenses.

18

a "controlled substance offense" under section 4B1.1 because the guidelines' definition of a "controlled substance offense" does not include inchoate crimes.[10]  In particular, Nasir points out that section 4B1.2 of the sentencing guidelines defines the term "controlled substance offense," to mean

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b).  Nasir notes this definition plainly does not mention inchoate crimes, and consequently asserts that his inchoate "attempt" crime should not qualify as a predicate offense for the career offender enhancement.  The analytical problem is more complicated than that, however, because the commentary to section 4B1.2 appears to expand the definition of "'controlled substance offense' [to] include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."  U.S.S.G. § 4B1.2 cmt. n.1.  That section of the

---

[10] An inchoate offense is "[a] step toward the commission of another crime, the step itself being serious enough to merit punishment."  Offense, *Black's Law Dictionary* (11th ed. 2019).  Inchoate offenses include, for example, the attempt, conspiracy, or solicitation to commit a crime. *Id.*

commentary, and, importantly, our precedent on the application of the commentary to the interpretation of the guidelines, informed the District Court's decision to apply the career offender enhancement. The question, then, is whether the more expansive commentary should be given controlling weight in interpreting the narrower guideline at issue here.[11]

## 2. *The Effect of the Commentary on our Interpretation of the Guidelines*

The extent to which the guidelines' commentary controls our interpretation of the guidelines themselves is informed by principles of administrative law. In *Stinson v. United States*, 508 U.S. 36 (1993), the Supreme Court considered how to classify the commentary to the sentencing guidelines and whether and when it should be given binding interpretive effect. Because the guidelines are written by the Sentencing Commission, a body that straddles both the legislative and judicial branches of the government, the Court

---

[11] The Sentencing Commission has proposed an amendment to the guidelines to explicitly include inchoate offenses in section 4B1.2(b). *Notice of Proposed Amendments*, 83 Fed. Reg. 65400-01, 65412-15 (Dec. 20, 2018). The proposed change has been submitted for notice and comment, and the time for notice and comment has closed. *Id.* However, the Commission does not currently have a quorum (and has not had one since at least 2018), so it cannot act on that issue. U.S. Sentencing Commission, 2018 Annual Report 2-3, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report.pdf.

determined that the commentary to the guidelines is more akin to an agency regulation than a statute. *Id.* at 44. Consequently, the Court determined that the commentary should "be treated as an agency's interpretation of its own legislative rule." *Id.* Relying on its opinion in *Bowles v. Seminole Rock & Sand Co.*, the Court said that such determinations should be given deference unless they are "plainly erroneous or inconsistent with the regulation." *Id.* at 45 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Further, the Court instructed that, "if the guideline which the commentary interprets will bear the construction," the commentary can expand the guidelines, particularly when the commentary is "interpretive and explanatory." *Id.* at 46-47. Accordingly, so-called *Seminole Rock* deference, also sometimes called *Auer* deference,[12] governs the effect to be given to the guidelines' commentary.

Our precedent has followed that course. In *United States v. Hightower*, 25 F.3d 182 (3d Cir. 1994), we applied the

---

[12] In 1945, the Supreme Court upheld a regulation from the Office of Price Administration in *Bowles v. Seminole Rock*, after it determined that the language of the regulation was consistent with Administration's interpretation of the regulation. *Seminole Rock*, 325 U.S. at 417. *Seminole Rock* thus became shorthand for the doctrine of deference to an administrative agency's interpretation of its own regulations. More than fifty years later, in *Auer v. Robbins*, 519 U.S. 452 (1997), the Court reinforced that doctrine. The doctrine is thus sometimes referred to as *Seminole Rock* deference, after the case that introduced it, and at other times referred to as *Auer* deference, the more recent reiteration of the doctrine.

21

principles set forth in *Stinson* to determine whether inchoate crimes are covered by sections 4B1.1 and 4B1.2 of the sentencing guidelines. We asked "whether the Sentencing Commission exceeded its statutory authority by expanding the definition of a controlled substance offense" when it included inchoate offenses as part of the definition of the term "controlled substance offense" in the commentary to section 4B1.2. *Hightower*, 25 F.3d at 184 (internal quotation marks omitted). We determined that the commentary to 4B1.2 was explanatory and therefore binding. *Id.* at 185-87. Specifically, although we admitted that the inclusion of inchoate crimes was an "expansion of the definition of a controlled substance offense[,]" we said that the expansion was "not 'inconsistent with, or a plainly erroneous reading of,' § 4B1.2(2) of the [s]entencing [g]uidelines, and that it does not 'violate[ ] the Constitution or a federal statute.'" *Id.* at 187 (second two alterations in original) (quoting *Stinson*, 508 U.S. at 38). We later followed that precedent in *United States v. Glass*, 904 F.3d 319 (3d Cir. 2018), in which we held that a conviction under a Pennsylvania "attempt" statute qualified as a predicate controlled substance offense for the career offender enhancement under the guidelines.

Our interpretation of the commentary at issue in *Hightower* – the same commentary before us now – was informed by the then-prevailing understanding of the deference that should be given to agency interpretations of their own regulations. Thus, although we recognized that the commentary expanded and did not merely interpret the definition of "controlled substance offense," we nevertheless gave it binding effect. In doing so, we may have gone too far in affording deference to the guidelines' commentary under the standard set forth in *Stinson*. Indeed, after the Supreme

22

Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), it is clear that such an interpretation is not warranted.

In *Kisor*, the Court cut back on what had been understood to be uncritical and broad deference to agency interpretations of regulations and explained that *Auer*, or *Seminole Rock*, deference should only be applied when a regulation is genuinely ambiguous. *Id.* at 2414-15. *Kisor* instructs that "a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on. Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference." *Id.* at 2415 (citation, brackets, and quotation marks omitted). Thus, before deciding that a regulation is "genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Id.* (citation and quotation marks omitted).

Even when a regulation is ambiguous, there are limits to deference. The agency's reading must be "reasonable[,]" as informed by "[t]he text, structure, history, and so forth[,]" which "establish the outer bounds of permissible interpretation." *Id.* at 2415-16. A court "must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight[,]" including whether it is the agency's "official position[.]" *Id.* at 2416. Moreover, an agency's interpretation must "in some way implicate its substantive expertise" if it is to be given controlling weight, since "[s]ome interpretive issues may fall more naturally into a judge's bailiwick." *Id.* at 2417. Finally, the reading must "reflect fair and considered judgment" and not simply be a "convenient litigating position." *Id.* (citations and quotation marks omitted). In short, the degree of deference

to be given an agency's interpretation of its own regulations is now context dependent.

### 3. *The Plain Text of the Guidelines*

The definition of "controlled substance offense" in section 4B1.2(b) of the guidelines is, again, in pertinent part as follows:

> [A]n offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b). The guideline does not even mention inchoate offenses. That alone indicates it does not include them. The plain-text reading of section 4B1.2(b) is strengthened when contrasted with the definition of "crime of violence" in the previous subsection. That definition in section 4B1.2(a) does explicitly include inchoate crimes, *see* U.S.S.G. § 4B1.2(a) ("The term 'crime of violence' means any offense … that – (1) has as an element the use, *attempted* use, or threatened use of physical force against the person of another[.]" (emphasis added)), which further suggests that the omission of inchoate crimes from the very next subsection was intentional.

That suggestion is separately bolstered by the fact that section 4B1.2(b) affirmatively lists many other offenses that do qualify as controlled substance offenses. As a familiar canon of construction states, *expressio unius est exclusio alterius*: the expression of one thing is the exclusion of the other. Applying that canon has led at least one court of appeals to conclude that section 4B1.2(b) does not include inchoate crimes. *See United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018) ("Section 4B1.2(b) presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses.").

Congress has delegated substantial responsibility to the Sentencing Commission, but, as the Supreme Court emphasized in *Kisor*, the interpretation of regulations ultimately "remains in the hands of the courts." 139 S.Ct. at 2420. In light of *Kisor*'s limitations on deference to administrative agencies, and after our own careful consideration of the guidelines and accompanying commentary, we conclude that inchoate crimes are not included in the definition of "controlled substance offenses" given in section 4B1.2(b) of the sentencing guidelines. Therefore, sitting en banc, we overrule *Hightower*, and, accordingly, Nasir is entitled to be resentenced without being classified as a career offender.

## III.   CONCLUSION

In sum, we will affirm Nasir's convictions, will vacate his sentence, and will remand for resentencing consistent with this opinion.

BIBAS, *Circuit Judge*, concurring, with whom AMBRO, JORDAN, GREENAWAY, JR., KRAUSE, RESTREPO, *Circuit Judges*, join:

Judges interpret the law. That applies to the U.S. Sentencing Guidelines too. If the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer. The judge's lodestar must remain the law's text, not what the Commission says about that text.

So too here. The plain text of the Guidelines' career-offender enhancement does not include inchoate crimes. The commentary says that it does. The majority rightly rejects this extra-textual invitation to expand a serious sentencing enhancement, and I join its opinion.

But the narrow scope of today's holding hints at a broader problem. For decades, we and every other circuit have followed the Supreme Court's guidance in *Stinson*. That meant we gave nearly dispositive weight to the Sentencing Commission's commentary, not the Guidelines' plain text. 508 U.S. at 44–46; *see also, e.g.*, *United States v. Keller*, 666 F.3d 103, 108–09 (3d Cir. 2011); *United States v. Boggi*, 74 F.3d 470, 474–75 (3d Cir. 1996).

Now the winds have changed. In *Kisor*, the Supreme Court awoke us from our slumber of reflexive deference: agency interpretations might merit deference, but only when the text of a regulation is truly ambiguous. Before deferring, we must first exhaust our traditional tools of statutory construction. Anything less is too narrow a view of the judicial role.

1

We must look at things afresh. Old precedents that turned to the commentary rather than the text no longer hold. *See Hassen v. Gov't of the V.I.*, 861 F.3d 108, 114 n.5 (3d Cir. 2017) (noting that we may revisit our precedents when they conflict with intervening Supreme Court precedent). Tools of statutory interpretation have thus been thrust to the fore. And one tool among many stands out as well suited to the task: the rule of lenity. As we rework our Sentencing Guidelines cases, lenity is the tool for the job.

## I. THE RULE OF LENITY'S VIRTUES

As Chief Justice Marshall explained, the rule of lenity is venerable. "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). It first arose to mitigate draconian sentences. As English statutes kept expanding the death penalty and curtailing mercy, courts tempered them by construing them narrowly. Livingston Hall, *Strict or Liberal Construction of Penal Statutes*, 48 Harv. L. Rev. 748, 749–51 (1935). The canon was well established by the time of Blackstone. 1 William Blackstone, *Commentaries* *88. And it took root in our law soon thereafter. *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

Under the rule of lenity, courts must construe penal laws strictly and resolve ambiguities in favor of the defendant. *See, e.g.*, *Liparota v. United States*, 471 U.S. 419, 427 (1985); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 296 (2012). The touchstone is the text: the "ordinary," evidently intended meaning of "the words of the statute." *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

2

The rule of lenity serves three core values of the Republic. First, it is entwined with notice and thus due process. *See McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.); *United States v. R.L.C.*, 503 U.S. 291, 309 (1992) (Scalia, J., concurring). It gives citizens fair warning of what conduct is illegal, ensuring that ambiguous statutes do not reach beyond their clear scope.

Second is the separation of powers. As Chief Justice Marshall explained, the rule of lenity stems from "the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *Wiltberger*, 18 U.S. (5 Wheat.) at 95. If Congress wants to criminalize certain conduct or set certain penalties, it must do so clearly.

And third but perhaps most importantly, the rule of lenity serves our nation's strong preference for liberty. As Judge Henry Friendly explained, lenity expresses our "instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* Benchmarks 196, 209 (1967). That approach fits with one of the core purposes of our Constitution, to "secure the Blessings of Liberty" for all citizens. U.S. Const. pmbl. Penal laws pose the most severe threats to life and liberty, as the Government seeks to brand people as criminals and lock them away. To guard against those threats, the rule of lenity favors respect for individual rights. *Wiltberger*, 18 U.S. (5 Wheat.) at 95. Together with the Double Jeopardy and Cruel and Unusual Punishments Clauses,

3

lenity is a longstanding safeguard against excessive punishment. John F. Stinneford, *Dividing Crime, Multiplying Punishments*, 48 U.C. Davis L. Rev. 1955, 1982–2001 (2015).

## II. LENITY, SENTENCING, AND *KISOR*

An agency's reading of its own regulation used to be almost dispositive. That applied equally to the U.S. Sentencing Commission and its commentary. *Stinson*, 508 U.S. at 44–46. But no more. Now, before a court defers to an agency interpretation, first it "must exhaust all the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron USA Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984)). "[O]nly when that legal toolkit is empty and the interpretive question still has no single right answer" may we give *Auer* deference to an agency's reading of its own rule. *Id.*; *see Auer v. Robbins*, 519 U.S. 452, 461 (1997).

A key tool in that judicial toolkit is the rule of lenity. Rather than defer to the commentary, we should use lenity to interpret ambiguous Guidelines. Even though the Guidelines are advisory, they exert a law-like gravitational pull on sentences. *See United States v. Booker*, 543 U.S. 220, 265 (2005) (Breyer, J., remedial majority opinion); *Peugh v. United States*, 569 U.S. 530, 543–44 (2013); U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* 8 (reporting that last year, 75% of offenders received sentences that were either within the Guidelines range or justified by a Guidelines ground for departure). So courts must still attend to the rule and its animating principles.

Lenity's third, key purpose applies here. True, one can debate the relevance of its first two purposes: whether the commentary gives enough notice and whether congressional approval of guidelines with their commentary respects the separation of powers. *Compare Mistretta v. United States*, 488 U.S. 361, 380–411 (1989), *with id.* at 422–27 (Scalia, J., dissenting). But in any event, the presumption of liberty remains crucial to guarding against overpunishment. When a guideline is ambiguous, the rule of lenity calls for adopting the more lenient of two plausible readings. It helps ensure that "criminal punishment … represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971).

There is no compelling reason to defer to a Guidelines comment that is harsher than the text. Whatever the virtues of giving experts flexibility to adapt rules to changing circumstances in civil cases, in criminal justice those virtues cannot outweigh life and liberty. Efficiency and expertise do not trump justice. Though expertise improves things for the future, sentencing requires justice tethered to the past. The rule of lenity takes precedence as a shield against excessive punishment and stigma.

That does not mean that lenity displaces all commentary. Only when a comment to an otherwise ambiguous guideline has a clear tilt toward harshness will lenity tame it. Some provisions may have no consistent tilt across all defendants. If so, *Auer* deference might still apply.

Here, however, the guideline's plain text does not include inchoate offenses. The commentary says it does, making it harsher. So we rightly refuse to defer.

\* \* \* \* \*

Courts play a vital role in safeguarding liberty and checking punishment. That includes reading the Sentencing Guidelines. Some provisions are ambiguous. But as *Kisor* teaches, instead of deferring to the commentary the moment ambiguity arises, judges must first exhaust our legal toolkit. This will require work; our old precedents relying strictly on the commentary no longer bind. In undertaking this task, we must not forget the rule of lenity.