**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1891
_____

UNITED STATES OF AMERICA

v.

XAVIER JOSEY,
                    Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4:23-cr-00254-001)
District Judge: Honorable Matthew Brann
_____

Argued April 30, 2025
Before: KRAUSE, BIBAS, and MONTGOMERY-REEVES,
*Circuit Judges*

(Filed: September 19, 2025)


Frederick W. Ulrich **[ARGUED]**
Office of Federal Public Defender
100 Chestnut Street

Suite 306
Harrisburg, PA 17101
        *Counsel for Appellant*

Patrick J. Bannon **[ARGUED]**
Office of United States Attorney
235 N Washington Avenue
P.O. Box 309, Suitse 311
Scranton, PA 18503

Carlo D. Marchioli
Michael R. Scalera
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Recency as well as frequency and severity of prior offenses matters for sentencing under the United States Sentencing Guidelines. So in calculating a defendant's Criminal History Category, the Guidelines assign points for each prior sentence of imprisonment, but only if it was imposed

2

within a specified period of time looking back from "the defendant's commencement of the instant offense". U.S.S.G. § 4A1.2(e)(1), (2). For prior sentences exceeding one year and one month that "look-back period" is fifteen years, and for any other prior sentence, it is ten years. *Id.* The question presented by this appeal, however, is what conduct "commence[s] . . . the instant offense" to anchor the look-back period? By its terms, the Guideline says it is the conduct comprising the offense of conviction. The Sentencing Commission, however, included commentary to § 4A1.2 instructing that "commencement of the instant offense" includes "relevant conduct." *Id.* § 4A1.2 cmt. n.8. Per the so-called "Relevant Conduct Guideline" at U.S.S.G. § 1B1.3, "relevant conduct" includes "all acts and omissions . . . that were part of the same course of conduct." *Id.* § 1B1.3(a)(2). And § 1B1.3's commentary, in turn, describes "same course of conduct" with potential to sweep in a wide range of similar activity. *See id.* § 1B1.3 cmt. n.5(B)(ii).

In this case, the District Court sentenced Appellant Xavier Josey treating "commencement of the instant offense" as if the Guidelines commentary controlled, so it looked back from the start of what it considered "relevant conduct" rather than from the start of Josey's actual offense of conviction, counting three prior sentences towards Josey's criminal history score that would otherwise have been excluded and producing a Guidelines range of 24 to 30 months instead of 15 to 21 months. Under our precedent, however, courts may consider commentary only when the text of a particular Guideline is genuinely ambiguous, *United States v. Nasir*, 17 F.4th 459, 471

3

(3d Cir. 2021) (en banc), and here there is no such ambiguity: "[C]ommencement of the instant offense" means the start of the conduct comprising the offense of conviction, i.e., the specific offense conduct for which the defendant is then being sentenced. We will therefore vacate Josey's sentence and remand for resentencing using the correct Criminal History Category.

## I.     **Background**

In 2013, Josey pleaded guilty to three counts of indecent liberties with a child, in violation of North Carolina law. PSR ¶ 4. As a consequence of that conviction, he was required under a provision of the Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20913(b), to register federally as a sex offender and to update his registration within three days of any change of name, residence, employment, or student status. PSR ¶ 4. Josey updated his information when he moved from North Carolina to Far Rockaway, New York, in 2017, and again when he moved within New York from Far Rockaway to Queens later that year. PSR ¶ 6-7. He also correctly updated his information when he moved within Queens in 2018. PSR ¶ 8. But New York had its own sex offender registration law that also required Josey to register and to verify, on an annual basis, that he continued to reside at his registered address. *See* N.Y. Correct. Law § 168-f(2)(a)-(b).

Josey was not as compliant with this New York statute. He submitted his verification of address in 2018 but then failed

4

to do so in 2019 or any subsequent year until January 2023, the date the Government first identifies Josey as residing in Pennsylvania. And after he moved to Pennsylvania, Josey also failed to update his address on the federal registry as required by SORNA. PSR ¶ 7-11. As a result, later that year Josey was indicted and pleaded guilty to knowingly failing to update his federal registration after traveling in interstate commerce, in violation of 18 U.S.C. § 2250(a). PSR ¶ 1-3; J.A. 15-22.

In anticipation of sentencing, the Probation Office prepared a Presentence Investigation Report (PSR) that calculated a Guidelines range using an offense level of 10 based on Josey's plea to a SORNA violation, and a criminal history score of 13 corresponding to a Criminal History Category of VI. That criminal history score took account of Josey's numerous prior convictions dating back at least thirteen years, to 2010. The resulting advisory Guidelines range was 24 to 30 months' imprisonment. PSR ¶ 36, 79.

Josey filed objections to the PSR, pointing out that under U.S.S.G. § 4A1.2(e)(2), only those sentences imposed "within ten years of the defendant's commencement of the instant offense" should be counted towards his criminal history, yet three of the convictions counted by the Probation Office—two in 2010 and one in 2011[1]—had resulted in

---

[1] These include a six-month probation imposed in 2012 for a 2010 conviction for possession of drug paraphernalia (one criminal history point); a 45-day imprisonment, followed by 30 months' supervision, in 2011 for a 2010 conviction for injury

sentences imposed more than 10 years before his 2023 SORNA violation. PSR Addendum 1-2. And without those sentences, which added four points to his criminal history score, Josey would have only 9 points, placing him in Criminal History Category IV instead of VI and reducing his Guidelines range to 15 to 21 months' imprisonment.

The Probation Office disagreed, reasoning that the term "instant offense" in § 4A1.2(e)(2) includes "relevant conduct," defined in U.S.S.G. § 1B1.3(a)(2) as "all acts and omissions . . . that were part of the same course of conduct." So the PSR maintained that the "instant offense" in Josey's case commenced in New York in 2019 when he failed to submit his state address verification, and that Josey's 2010 and 2011 sentences were thus countable as having been imposed within ten years of the "commencement of the instant offense." PSR Addendum 1-2. So the PSR recommended the District Court sentence Josey using Criminal History Category VI. *Id*.

At his sentencing hearing, Josey renewed his objection, but the District Court resolved it in the Government's favor. J.A. 24-25. Notably, the District Court did not reference the

---

to personal property (two criminal history points); and an 8-to-10 month imprisonment in 2012 for a 2011 conviction for breaking and entering (one criminal history point). PSR ¶ 26-27, 29. Because each of these sentences was for less than one year and one month, they could only be counted if they were imposed within ten years of the "commencement of [Josey's] instant offense." U.S.S.G. § 4A1.2(e)(2).

6

commentary to § 4A1.2, in which the Sentencing Commission cited § 1B1.3 and instructed that "the term 'commencement of the instant offense' includes any relevant conduct." U.S.S.G. § 4A1.2 cmt. n.8. Nor did the Court explain why it otherwise believed it appropriate to consult the Relevant Conduct Guideline at all in interpreting the text of § 4A1.2(e)(2). Nonetheless, it proceeded, consistent with § 4A1.2's commentary, to consider relevant conduct, agreed with the Probation Office that Josey's state-law verification violation qualified as relevant conduct because it was part of "the same course of conduct" as his SORNA violation, and therefore held that Josey's 2010 and 2011 sentences fell within the ten-year look-back period, placing him in Criminal History Category VI.

In concluding that Josey's state-law violation was part of the same course of conduct as his SORNA violation, the District Court relied heavily on *United States v. Caldwell*, 746 F. App'x 518 (6th Cir. 2018), where the Sixth Circuit confronted similar facts and rejected an argument much like Josey's. *Id.* In contrast to its approach to § 4A1.2, however, the District Court, in interpreting the Relevant Conduct Guideline, did explicitly distinguish between text and commentary. It acknowledged the Government's argument that, applying the commentary interpreting "same course of conduct," U.S.S.G. § 1B1.3 cmt. n.5(B)(ii), Josey's state and federal violations constituted a "continuous course of conduct," App. 24, but it also recognized that, under *Nasir*, deference to Guidelines commentary is only appropriate when the text of a Guideline is itself ambiguous. The District Court

7

therefore stated it would "disregard the [Relevant Conduct Guideline's] commentary" and rely only on the plain text of § 1B1.3 and the "persuasive analysis" of *Caldwell* to conclude Josey's violation of New York law was part of "the same course of conduct" as his violation of SORNA.[2] *Id.* at 25.

Applying this reasoning, the District Court concluded that Josey fell within Criminal History Category VI, resulting in a Guidelines range of 24 to 30 months' imprisonment, and it sentenced Josey to the bottom of that range. J.A. 25, 29. This timely appeal followed.

## II.   **Jurisdiction and Standard of Review**

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's interpretation of the Sentencing Guidelines *de novo*. *United States v. McIntosh*, 124 F.4th 199, 205 (3d Cir. 2024).

---

[2] As *Caldwell* itself expressly relied on the § 1B1.3 commentary in reaching its conclusion, the District Court's reliance on *Caldwell*'s analysis necessarily includes deference to the § 1B1.3 commentary. *See United States v. Caldwell*, 746 F. App'x 518, 520-21 (6th Cir. 2018) (citing U.S.S.G. § 1B1.3 cmt. n.5(B)(ii)). We need not decide today whether such deference would be appropriate under *Nasir*, however, because we conclude it was error to look to § 1B1.3 in the first place.

### III.    Discussion

On appeal, Josey challenges both the District Court's decision to consider relevant conduct in determining the "commencement of the instant offense" in U.S.S.G. § 4A1.2(e)(2), and the Court's conclusion that his state-law violation was part of "the same course of conduct" as his SORNA violation under U.S.S.G. § 1B1.3.   As explained below, however, we need not reach the second issue because "relevant conduct" is simply not relevant in determining the look-back period in § 4A1.2.   Instead, "commencement of the instant offense" unambiguously means the start of the conduct constituting the offense of conviction.   So whether the District Court implicitly deferred to § 4A1.2's commentary or simply assumed, as it seems the *Caldwell* court did, that relevant conduct was properly considered under § 4A1.2, it erred in concluding that Josey "commenc[ed] . . . the instant offense," U.S.S.G. § 4A1.2(e)(2), when he violated New York law in 2019 and that the sentences imposed for his 2010 and 2011 convictions fell within the ten-year look-back period.

Below we explain why "commencement of the instant offense" does not include relevant conduct and then address the implications for Josey's sentence.

9

**A. "Commencement of the Instant Offense" Does Not Include Relevant Conduct.**

1. Deference to Guidelines Commentary Is Not Presumed.

For many years, we treated the Sentencing Commission's commentary as authoritative and gave it controlling weight unless it was "inconsistent with, or a plainly erroneous reading of" the Guidelines. *United States v. Metro*, 882 F.3d 431, 437 (3d Cir. 2018) (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)). That changed when the Supreme Court decided *Kisor v. Wilkie* in 2019 and held that courts should defer to agency interpretations of their own regulations only where the regulation is genuinely ambiguous. 588 U.S. 558, 573 (2019). In *Nasir*, we interpreted that holding to extend to the Sentencing Guidelines because the Commission's interpretation of its Guidelines is akin to an agency's interpretation of its own regulations. *See* 17 F.4th at 470-71. Accordingly, we held that deference to Guidelines commentary should no longer be presumed. *Id.*

Instead, we announced a three-step test to decide whether to defer to a particular provision of the Guidelines commentary. *See id.* at 471. First, we ask whether the Guideline is "genuinely ambiguous" after "carefully consider[ing] the text, structure, history, and purpose." *Id.* (quoting *Kisor*, 588 U.S. at 575). If it is not, our inquiry is at an end, and we apply the plain text of the Guideline. *Id.* If the Guideline is genuinely ambiguous, we proceed to step two and

10

ask if the commentary is "reasonable," *id.*, meaning the commentary "clarif[ies] the ambiguity" identified in step one without "chang[ing] the meaning of the text," *United States v. Chandler*, 104 F.4th 445, 450 (3d Cir. 2024). Put another way, the commentary must be within "the outer bounds of permissible interpretation." *Nasir*, 17 F.4th at 471 (quoting *Kisor*, 588 U.S. at 576). Finally, if the commentary is reasonable, we proceed to step three and consider "whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* (quoting *Kisor*, 588 U.S. at 576). If the commentary's interpretation "implicate[s] [the Commission's] substantive expertise" and "reflect[s] fair and considered judgment," we will defer to it. *Id.* (quoting *Kisor*, 588 U.S. at 577, 579).

Here, the District Court recognized the need under *Nasir* to consider the text of a Guideline before turning to its commentary, but it performed that analysis only on § 1B1.3's "same course of conduct" language. Before considering § 1B1.3's language at all, however, the District Court should have first performed the *Nasir* analysis on the Guidelines language "commencement of the instant offense" under § 4A1.2. Instead, the District Court implicitly deferred to § 4A1.2's commentary, which instructs that "the term 'commencement of the instant offense' includes any relevant conduct" and cites the Relevant Conduct Guideline at § 1B1.3. U.S.S.G. § 4A1.2 cmt. n.8. But § 4A1.2(e) itself identifies the prior sentences that count towards a defendant's Criminal History Category as only those imposed within the defined look-back period from the "commencement of the instant

11

offense." *Id.* § 4A1.2(e). Thus, under *Nasir*, the first step—and for our purposes today, the last—is whether the text of § 4A1.2(e)(2) is itself ambiguous.

2. "Commencement of the Instant Offense" Is Not Ambiguous.

To discern whether the text of § 4A1.2(e)(2) is genuinely ambiguous, we employ "the traditional tools of construction" including examining "the text, structure, history, and purpose" of the Guideline. *Nasir*, 17 F.4th at 471 (cleaned up) (quoting *Kisor*, 588 U.S. at 575). A Guideline is genuinely ambiguous if it is "susceptible to more than one reasonable reading." *Kisor*, 588 U.S. at 566. Here, the traditional tools of construction demonstrate that the phrase "commencement of the instant offense" is susceptible to only one reasonable meaning: it refers to the start of the specific offense for which a defendant is being sentenced, meaning it does not include relevant conduct or other offenses.

a. Text

We look first to the plain text of the Guideline and assume that words carry their ordinary meaning. *See United States v. Caraballo*, 88 F.4th 239, 246 (3d Cir. 2023). Because the phrase "commencement of the instant offense" is not expressly defined in the Guidelines, we ascertain the plain meaning of each of its constituent terms, *see id.*, by "refer[ence] to standard reference works such as legal and

12

general dictionaries," *Da Silva v. Att'y Gen.*, 948 F.3d 629, 635 (3d Cir. 2020) (quotation omitted).

We begin, appropriately, with the term "commencement." At the time § 4A1.2(e) was drafted, Black's Law Dictionary defined "commence" as "[t]o initiate by performing the first act," "[t]o institute," or to "start." *Commence*, Black's Law Dictionary (5th ed. 1979). This definition captures two distinct ideas that pertain here. First, to "commence" something is to begin it. The term does not refer to mere preparation, nor does it encompass similar or related activities; rather it focuses on the "first act" of the particular venture under consideration. Second, "commence" is defined as the performance of an "act," in this case an act by a defendant. Thus, "commencement" refers to the first act taken by a defendant as part of the "instant offense."

So what of the term "instant offense"? At the time § 4A1.2(e) was drafted, "offense" was defined simply as "[a] felony or misdemeanor; a breach of the criminal laws." *Offense*, Black's Law Dictionary (5th ed. 1979). The Government contends that the term "offense" is ambiguous because it lacks a clear temporal component. Ans. Br. at 20. But we do not read words in isolation. The term at issue is "instant offense," and the word "instant," which modifies "offense," provides precisely that temporal overlay. Contemporary dictionaries defined "instant" as "immediate," "direct," "present," or "current." *Instant*, Webster's New Collegiate Dictionary (1980). Webster's, in fact, provides, as an illustrative example of the word "instant," the phrase:

"previous felonies not related to the instant crime." *Id.* Thus, the term "instant offense" means the immediate or present offense under consideration, as distinguished from prior offenses. In this way, "instant offense" is synonymous with the term "offense of conviction," as both refer to the specific offense conduct for which a defendant has been convicted. Notably, the Relevant Conduct Guideline itself makes this distinction by acknowledging that relevant conduct may not necessarily comprise part of "the instant offense of conviction."[3] *See* U.S.S.G. § 1B1.3(c).

b. Structure and History

The structure and history of the Sentencing Guidelines and § 4A1.2(e) further demonstrate that the phrase

---

[3] Several Guidelines also expressly distinguish an "instant offense" from similar or related offenses, *see, e.g.*, U.S.S.G. § 4A1.2(c)(1), and others distinguish an "instant offense" from "relevant conduct," *see*, *e.g.*, U.S.S.G. §§ 3C1.1, 5G1.3(b). Though not dispositive, these consistent uses elsewhere in the Guidelines reinforce our conclusion here. *See* U.S.S.G. § 1B1.1 cmt. 2 (instructing that "[d]efinitions of terms [that] appear in other sections . . . are not designed for general applicability"); *United States v. Abreu*, 32 F.4th 271, 277 (3d Cir. 2022) (noting that, if this commentary is binding under *Nasir*, it may require determining the meaning of the same term in different section of the Guidelines on a case-by-case basis).

"commencement of the instant offense" refers to the start of the specific offense conduct for which a defendant is then being sentenced.

When the first Sentencing Commission met to draft the Guidelines, one of the most significant questions they faced was the scope of conduct that should be used to determine a defendant's sentence. *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 8-9 (1988). The Commission considered two approaches: the "charge offense" system and the "real offense" system. *Id.* Under a "charge offense" system, a sentencing court could only consider facts and conduct that were charged and proven as part of the elements of a defendant's offense. *Id.* at 9. But under a "real offense" system, courts could consider additional information, including the manner in which a defendant committed the offense, the circumstances leading up to and following the offense, and the harm caused as a result. *Id.* at 10.

The Commission initially sought to develop a "real offense" system, which most aligned with how pre-Guidelines courts approached sentencing. However, it ultimately shifted closer to a modified or hybrid system under which certain Guidelines turn solely on the specific offense charged and others direct courts to look to additional conduct and surrounding circumstances. *Id.* at 11-12. Under Chapter Two of the Guidelines, for example, courts begin by identifying the applicable "Offense Conduct" Guideline, a pure "charge offense" inquiry that turns only on the specific offense for

which a defendant has been convicted. *See* U.S.S.G. § 1B1.1(a)(1). From there, however, each Offense Conduct Guidelines incorporates "real offense" elements by directing courts to consider additional conduct and circumstances beyond the charged offense through various specific offense characteristics and cross-references. *See, e.g.*, U.S.S.G. § 2A3.5(b)(1) (providing, in the case of a sentence for an 18 U.S.C. § 2250(a) violation, that a defendant's Base Offense Level may be increased if he commits another sex offense "while in a failure to register status").

Chapter Four adopts a similar structure. It begins by defining the relevant criminal history look-back period, the types of prior sentences to be counted, and the number of points to be added for each sentence. *See Id.* §§ 4A1.1, 4A1.2. These Guidelines set forth a mechanical formula for calculating a Criminal History Category that does not invite courts to consider a defendant's specific conduct, surrounding circumstances, or the relationship between prior offenses and the instant offense of conviction. It is only once a Criminal History Category has been calculated that § 4A1.3 provides an opportunity for courts to consider additional past conduct and circumstances in deciding whether to apply an upward or downward departure if the calculated Criminal History Category substantially under- or over-represents a defendant's actual criminal history. *See id.* § 4A1.3. The fact that Chapter Four consolidates these "real offense" considerations within § 4A1.3 and permits them only in deciding whether to apply a *departure* from a Criminal History Category demonstrates that

16

they do not have a role to play in calculating an initial criminal history score under § 4A1.2.

Finally, if any doubt remained that the phrase "commencement of the instant offense" excludes relevant conduct, the Relevant Conduct Guideline itself dispels it. Section 1B1.3 directs courts to consider "relevant conduct" in applying the specific offense characteristics, cross-references, and adjustments in Chapters Two and Three of the Guidelines. *Id.* § 1B1.3(a). But it takes a different approach for the "[f]actors in Chapters Four and Five that establish the guideline range," *id.* § 1B1.3(b), providing that these factors "shall be determined on the basis of the conduct and information specified in the respective guidelines" within those chapters, *id.* And, as noted above, nothing in Chapter Four or the text of § 4A1.2 permits courts to consider any offenses other than "the instant offense" when determining the start of the look-back period.

In sum, "commencement of the instant offense" unambiguously refers to the start of the specific offense for which a defendant is then being sentenced and does not include separate or related offense conduct.

## B. The Implications for Josey's Sentence.

Given the unambiguous meaning of § 4A1.2(e), the District Court erred in effectively deferring to the Guidelines

17

commentary and calculating the start of Josey's criminal history look-back period based on his New York state-law violations. To determine when Josey's instant offense "commenced," the Court should have looked to the elements of the charged SORNA violation under 18 U.S.C. § 2250(a) and identified the first culpable act comprising that offense.

Section 2250(a) has three elements, two of which are prerequisites to criminal liability but not themselves conduct commencing the offense.

First, a defendant must be "required to register" under SORNA. 18 U.S.C. § 2250(a)(1). This element describes a status, rather than an act, and so does not mark the "commencement" of the offense. *Cf. City of Grants Pass v. Johnson*, 603 U.S. 520, 546-47 (2024) (distinguishing between the status of homelessness and the act of camping on public property); *Rehaif v. United States*, 588 U.S. 225, 230 (2019) (distinguishing between the status of being an illegal alien and the act of possessing a firearm).

Second, the registered individual must satisfy a jurisdictional element by either committing the underlying sex offense on federal, tribal, or territorial land, or—as relevant here—by "travel[ing] in interstate or foreign commerce." 18 U.S.C. § 2250(a)(2)(B). Interstate travel is an act, but that act in isolation is not what § 2250(a) criminalizes. A sex offender may cross state lines without violating § 2250(a) and may even move permanently to a new state, provided he updates his registration after doing so. *See Carr*

18

*v. United States*, 560 U.S. 438, 447 (2010) ("Once a person becomes subject to SORNA's registration requirements . . . that person can be convicted under § 2250 if he thereafter travels and then fails to register."). Thus, the interstate- or foreign-travel element functions as a jurisdictional nexus and predicate for the culpable omission of failing to update a registration.[4]

It is therefore the third element—the "knowing[] fail[ure] to register or update a registration as required by [SORNA]" following interstate travel—that constitutes the first culpable act comprising the offense. 18 U.S.C. § 2250(a)(3). Under SORNA, a sex offender must update his registration within three days of "each change of name, residence, employment, or student status," 34 U.S.C. § 20913(c).

In Josey's case, this requirement was triggered when he changed his residence and employment upon moving to Pennsylvania, so the violative conduct that "commence[d] . . . the instant offense" occurred three days after Josey's

---

[4] In *Carr*, the Supreme Court observed that, unlike many jurisdictional elements, the act of interstate travel by registered sex offenders was part of "the very conduct at which Congress took aim" by enacting SORNA. *Carr*, 560 U.S. at 454. Nonetheless, § 2250(a) by its own terms only makes interstate travel a culpable act where it is followed by a failure to update a registration, meaning the offense does not commence until the failure to register occurs.

19

change in residence or employment after entering Pennsylvania, whichever came first. That took place, according to both the indictment and the PSR, in January 2023,[5] meaning that § 4A1.2(e)(2)'s ten-year look-back period extended only as far back as January 2013. Josey's prior sentences imposed in 2010 and 2011 thus fall outside the

---

[5] There is a discrepancy between the indictment and PSR as to the precise date of the move triggering Josey's registration requirement. Although neither document identifies the exact date when Josey changed his residence, the indictment states that the offense began on or about January 21, 2023, J.A. 15, while the PSR reflects that Josey began working at a McDonald's in Pennsylvania on January 10, 2023, PSR ¶ 10. Thus, the PSR would place "the commencement of the instant offense" three days later on January 13, 2023. We need not decide today how such a discrepancy should be resolved or whether a sentencing court may rely in this context on facts in a PSR that contradict those in a charging instrument because it is immaterial in Josey's case. *Cf. United States v. Kayfez*, 957 F.2d 677, 678-79 (9th Cir. 1992) (holding that the starting date alleged in an indictment does not fix the start of the criminal history look-back period); *United States v. Eske*, 925 F.2d 205, 207-08 (7th Cir. 1991) (holding that a sentencing court properly used a starting date preceding that charged in the indictment to determine the start of a criminal history look-back period). All three sentences in dispute were imposed in 2010 and 2011 and are thus properly excluded under either the indictment's or the PSR's commencement date.

relevant look-back period and should have been excluded in determining his Criminal History Category.  J.A. 25.

**IV.    <u>Conclusion</u>**

For the foregoing reasons, we will vacate Josey's sentence and remand for resentencing consistent with this opinion.