**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3338
_____

UNITED STATES OF AMERICA

v.

DORIAN DAWSON,
Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 2:18-cr-00085-001)
District Judge: Honorable David S. Cercone
_____

Argued February 10, 2022

(Filed: April 28, 2022)

Before: GREENAWAY, JR., SCIRICA, and RENDELL,
*Circuit Judges*.

Lisa B. Freeland
Renee Pietropaolo (argued)
Office of Federal Public Defender

1001 Liberty Avenue
Suite 1500
Pittsburgh, PA 15222

Counsel for Appellant

Stephen R. Kaufman
Adam N. Hallowell (argued)
Laura S. Irwin
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

Counsel for Appellee
_____

OPINION OF THE COURT
_____

RENDELL, *Circuit Judge*.

Dorian Dawson appeals his sentence for possession of fentanyl with intent to distribute. He raises two claims of error. First, Dawson argues that he should not have been subject to a career offender enhancement because his state drug trafficking convictions are not "controlled substance offenses" under the Sentencing Guidelines. We hold that those convictions are career offender predicates, as the state offense, 35 Pa. Cons. Stat. §780-113(a)(30), does not criminalize a broader range of conduct than the Guidelines. Second, Dawson contends that his sentence cannot stand because the District Court erred in failing to rule on a controverted issue of fact at sentencing—to

wit, whether Dawson caused one of his fentanyl 'clients' to die from a drug overdose. *See* Fed. R. Crim. P. 32(i)(3)(B). However, Dawson failed to preserve this argument for plenary review, as he did not object when the putative error became evident. Reviewing for plain error then, we find that Dawson has not shown his substantial rights were affected.

Accordingly, we will affirm.

I.

On October 17, 2016, Dawson was arrested in Brentwood, Pennsylvania. He was caught driving a car containing bags of fentanyl, stamped with the label "Peace of Mind". Earlier that day, Police had responded to the overdose death of one "L.B.", who was found with empty and full bags of fentanyl bearing the same "Peace of Mind" label. Investigation of L.B.'s cell phone revealed that Dawson had been supplying L.B. with fentanyl; Police then used the deceased's phone to set up a drug deal with Dawson, apprehending him upon his arrival.

Dawson was initially charged in state court with various drug trafficking offenses, including drug delivery resulting in death, 18 Pa. Cons. Stat. § 2506, for his alleged role as the supplier of L.B.'s fatal dose. However, the case was ultimately adopted by federal authorities in the Western District of Pennsylvania, who indicted Dawson on one count of possessing fentanyl with intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(C). Dawson entered an open guilty plea to this sole count.

Dawson was caught with only four grams of fentanyl, but a lengthy history of drug dealing—he had been convicted *four* times of heroin trafficking under 35 Pa. Cons. Stat. § 780-113(a)(30)—led Probation to classify him as a career offender and calculate a substantial guidelines range of 188 to 235 months' imprisonment. Dawson objected to this career offender designation, yet he conceded that then-controlling precedent, *United States v. Hightower*, 25 F.3d 182 (3d Cir. 1994), foreclosed his argument that § 780-113(a)(30) is not categorically a "controlled substance offense" under the applicable Guideline, U.S.S.G. § 4B1.2(b) ("The term 'controlled substance offense' means an offense under federal or state law . . . that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . ."). As we discuss at length below, the new life given to this contention by our overruling of *Hightower* in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), grounds the primary issue in this appeal.

Dawson also objected to the Pre-Sentence Report's ("PSR") mention of L.B.'s death from drug overdose and, in their pre-sentencing submissions, Dawson and the Government sparred over whether the death should be attributed to Dawson at sentencing under 18 U.S.C. § 3553(a). Prior to sentencing, the District Court tentatively overruled Dawson's objection to those portions of the PSR dealing with the overdose and invited him to make further submissions on the matter at the upcoming hearing.

On November 5, 2020, the District Court sentenced Dawson to 142 months' imprisonment, reflecting a 46-month downward variance from the bottom end of his Guidelines range. Although the District Court conclusively overruled his

objection to the PSR's inclusion of L.B.'s overdose, the Court neither held that Dawson caused the death nor deemed the issue irrelevant to crafting a sentence under the § 3553(a) factors. *See* Fed. R. Crim. P. 32(i)(3)(B). However, as we explain in detail below, Dawson did not preserve any claim of error stemming from this purported omission.

Dawson timely appealed.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The interpretation of the Guidelines is a legal question, so we exercise plenary review. *United States v. Wilson*, 880 F.3d 80, 83 (3d Cir. 2018). We review unpreserved objections for plain error. *United States v. Dahl*, 833 F.3d 345, 349 (3d Cir. 2016).

## III.

### A.

We begin by addressing the career offender enhancement. The District Court agreed with Probation that Dawson had at least two qualifying predicate convictions—his repeated violations of 35 Pa. Cons. Stat. § 780-113(a)(30)—for "controlled substance offense[s]" under the Guidelines, making him a career offender. *See* U.S.S.G. § 4B1.1(a) ("A defendant is a career offender if . . . [he] has at least two prior

5

felony convictions of . . . a controlled substance offense.").[1] Before us, Dawson disputes this finding, arguing that § 780-113(a)(30) is not a controlled substance offense.[2] His argument relies on the fact that one element of § 780-113(a)(30), the "delivery . . . [of] a controlled substance," can be satisfied by the "attempted transfer . . . of a controlled substance." 35 Pa. Cons. Stat. § 780-102. Dawson insists this means that Pennsylvania drug "delivery" cannot be a drug "distribution" offense under U.S.S.G. § 4B1.2(b).

The District Court examined this issue through the lens of then-applicable precedent, *United States v. Hightower*, 25

---

[1] The Parties do not dispute that § 4B1.1(a)'s other requirements are met here: Dawson was at least 18 years old when he committed the instant offense and that offense—21 U.S.C. § 841(a) and § 841(b)(1)(C)—is a Guidelines "controlled substance offense." *See, e.g.*, *United States v. McQuilkin*, 97 F.3d 723, 725 n.3 (3d Cir. 1996) (stating that § 841(a) is a "controlled substance offense[]"); *United States v. Ward*, 972 F.3d 364, 371 n.8 (4th Cir. 2020). As we discuss in detail below, however, Dawson's position commits him to the untenable conclusion that § 841(a) is *not* categorically a controlled substance offense.

[2] The Government insists that we settled this very issue in *United States v. Glass*, 904 F.3d 319 (3d Cir. 2018). There, we stated expansively that "§ 780-113(a)(30) does not sweep more broadly than § 4B1.2." *Id*. at 324. This broad language cannot be considered controlling, however, as the *Glass* Court ruled only on the question of whether the state statute was overbroad *insofar as it proscribed mere offers to sell drugs*. *See id*. at 322–23.

F.3d 182 (3d Cir. 1994), in which we relied on the Sentencing Commission's Commentary to hold that § 4B1.2(b) includes inchoate drug offenses. Under this rule, Dawson's point went nowhere: even if § 780-113(a)(30) somehow codifies an inchoate crime within an otherwise substantive provision, it would nonetheless be included in the Guideline via the Commentary. After Dawson had been sentenced, however, we reversed course in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), overruling *Hightower* and holding that "inchoate crimes are not included in" § 4B1.2(b)'s "controlled substance offense" definition, *id*. at 472. Our about-face would revive Dawson's argument but for one fact: § 780-113(a)(30) is not an inchoate drug crime.

*Nasir* is distinguishable because § 780-113(a)(30) is a *completed* offense which, in one definition, uses the word

"attempted" in its ordinary sense.[3][4]  This subtle distinction was first discerned by Chief Judge Sutton, writing in a Sixth Circuit case comparable to *Nasir*.  *See United States v. Havis*, 929 F.3d 317, 319 (6th Cir. 2019) (Sutton, J., concurring in the denial of en banc reconsideration) (noting that the term "attempted transfer," as used to define "delivery" in a drug trafficking statute, takes its "ordinary," rather than "legal term-of-art," meaning).  The Sixth Circuit went on to adopt and apply this distinction in a case materially identical to Dawson's.  *See United States v. Thomas*, 969 F.3d 583, 584-85 (6th Cir. 2020) (per curiam); *see also United States v. Garth*, 965 F.3d 493, 497 (6th Cir. 2020).[5]

---

[3] In *Nasir*, we considered whether § 4B1.2(b) "include[s] inchoate crimes."  17 F.4th at 469 n.10 (citing Offense, BLACK'S LAW DICTIONARY (11th ed. 2019)) ("An inchoate offense is '[a] step toward the commission of another crime, the step itself being serious enough to merit punishment.'  Inchoate offenses include, for example, the attempt, conspiracy, or solicitation to commit a crime.").  Nasir had been classified as a career offender owing, in part, to a prior Virginia conviction for "attempting to possess cocaine with intent to distribute."  *Id.* at 464.  On appeal, he argued that the plain meaning of § 4B1.2(b) did not sweep in inchoate drug crimes like his and we should not defer to the Commentary's interpretation.  We agreed and, accordingly, found that Nasir was not a career offender.

[4] At Oral Argument, Dawson conceded that "*Nasir* is distinguishable."  Oral Arg. Tr. at 18.

[5] In *United States v. Thomas*, the appellant argued that his prior convictions for heroin delivery under Michigan law were not Guideline career offender predicates because the state statute could be satisfied by an "attempted transfer" of drugs.  969

The Sixth Circuit's analysis provides a useful paradigm for our consideration of Pennsylvania's drug trafficking statute. Although the Commonwealth's courts have provided little guidance on the meaning of "attempted transfer," careful analysis of statutory structure and prosecutorial practice reveal that § 780-113(a)(30) is not an inchoate crime. Instead, drug "delivery" is a complete offense, whether it is committed via actual or attempted transfer of drugs.

To start with, Pennsylvania prosecutes legal attempts to deliver drugs under the Code's general attempt provision, 18 Pa. Cons. Stat. § 901, rather than by charging a violation of § 780-113(a)(30) and then invoking § 780-102(b)'s "attempted transfer" definition.[6] To interpret "attempted transfer" as an embedded inchoate offense would mean holding that

---

F.3d 583, 584–85 (6th Cir. 2020) (per curiam). The Sixth Circuit disagreed, observing that "the definition of delivery used under Michigan (and federal) law—again, 'the actual, constructive, or attempted transfer of a controlled substance'— does not include 'attempted delivery.' Instead, it includes only 'attempted transfer.' And an attempted transfer qualifies as a completed delivery." *Id.* (internal citations omitted).

[6] *See, e.g.*, *Commonwealth v. Bernard*, 2019 PA Super 271, 218 A.3d 935, 938 n.1 (2019) (offense of "attempt to deliver a controlled substance" charged under 18 Pa. Cons. Stat. § 901); *Commonwealth v. Taylor*, No. 796 MDA 2018, 2019 WL 618749, at *1 (Pa. Super. Ct. Feb. 14, 2019) (same); *Commonwealth v. McCullough*, No. 1642 MDA 2013, 2014 WL 10752176, at *1 (Pa. Super. Ct. Dec. 9, 2014) (same); *Commonwealth v. Mills*, 478 A.2d 30, 31 (1984) (same).

Pennsylvania has codified a redundant, vestigial crime—violating the canon against surplusage. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) (canon against surplusage "is strongest when an interpretation would render superfluous another part of the same statutory scheme") (internal citations omitted).

Further, the "attempted transfer" of drugs cannot be an inchoate offense because drug "transfer" is not a codified crime. The Commonwealth defines "criminal attempt" as follows: "A person commits an attempt when, with intent *to commit a specific crime*, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa. Cons. Stat. § 901(a) (emphasis added). To be guilty of a legal attempt then, one must have the intent to commit some distinct, "specific crime." So, one cannot attempt "transfer" in the technical sense because the Commonwealth criminalizes only actual transfer, constructive transfer, and attempted transfer—not *mere* "transfer." 35 Pa. Cons. Stat. § 780-102(b); *Garth*, 965 F.3d at 497 ("Delivery means attempted *transfer*, not attempted *delivery*.").

Finally, Dawson's hypothesized inchoate offense would be inconsistent with Pennsylvania mens rea caselaw. If "attempted transfer" is an inchoate crime like any other, then 'intent' must be the applicable mens rea, as Dawson insists. But the mens rea applicable to drug "delivery" is merely *knowing*. *See Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (2004). The better reading of state law avoids such anomalies.

In sum, *Nasir* does not control here because it addressed only true inchoate offenses, none of which appear in § 780-113(a)(30). This conclusion does not settle the career offender

10

issue, however, as Dawson argues further that—*Nasir* aside—§ 780-113(a)(30) is categorically overbroad under the *ordinary meaning* of the term "distribution" in § 4B1.2(b). It is to that argument which we now turn.

1.

We use the categorical approach to determine if a past conviction is a career offender predicate, considering only the elements of the conviction statute, not the facts of the defendant's actual misconduct. *United States v. Williams*, 898 F.3d 323, 333 (3d Cir. 2018) (citing *United States v. Chapman*, 866 F.3d 129, 133 (3d Cir. 2017)). We compare the elements of that statute with the relevant Guidelines provision—here, § 4B1.2(b)'s definition of a "controlled substance offense." If the statute proscribes a broader range of conduct than the Guideline, then a conviction for the state offense will not count as a controlled substance offense. *Id.* at 334 (citing *Mathis v. United States*, 136 S. Ct. 2243 (2016)). But, if the statute proscribes an identical or narrower range of conduct, then it is a controlled substance offense. *See United States v. Daniels*, 915 F.3d 148, 151 (3d Cir. 2019).

Assessing categorical fit here, we look first to the conduct proscribed by Dawson's predicate offenses: his violations of 35 Pa. Cons. Stat. § 780-113(a)(30). This statute prohibits, *inter alia*, "the manufacture, *delivery*, or possession with intent to manufacture or deliver, a controlled substance . . . ." § 780-113(a)(30) (emphasis added). As noted above, Pennsylvania law defines "deliver" and "delivery" as "the actual, constructive, or *attempted transfer* from one person to another of a controlled substance, other drug, device or

11

cosmetic whether or not there is an agency relationship."  35 Pa. Cons. Stat. § 780-102(a) (emphasis added).

Now to the Guidelines, they define a "controlled substance offense" as:

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, *distribution*, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b) (emphasis added).[7]

The Parties agree that we must analyze the ordinary meaning of the Guideline text to determine if § 780-113(a)(30) is overbroad.  They differ, however, on what that analysis reveals and on the relevance of the Guideline's context.  We will begin by considering the "plain text" of the Guideline, *Nasir*, 17 F.4th at 471, and then go on to discuss its broader context, policy, and history, *see United States v. Perez*, 5 F.4th 390, 395 (3d Cir. 2021) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

---

[7] There is no dispute that § 780-113(a)(30) is an offense under state law, punishable by more than one year imprisonment.

2.

Starting with the plain text of § 4B1.2(b), we ask if the ordinary meaning of "an offense . . . that prohibits the . . . distribution . . . of a controlled substance" includes offenses that prohibit the "attempted transfer" of a controlled substance. *See, e.g.*, *United States v. Loney*, 219 F.3d 281, 294 (3d Cir. 2000). To assess ordinary usage, legal and general dictionaries are a good place to start, *United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008), especially dictionaries "from the era" of the Guideline's enactment, *see, e.g.*, *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014); *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them."). If legal sources provide definitions specific to the relevant context, then we ought to rely on those, at least when they are consistent with lay usage. *See, e.g.*, *Gresham v. Meden*, 938 F.3d 847, 849–50 (6th Cir. 2019).

"Distribution" means "giving out or division among a number, sharing or parceling out, allotting, dispensing, apportioning." BLACK'S LAW DICTIONARY 475 (6th ed. 1990); *see also* OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("The action of dividing and dealing out or bestowing in portions among a number of recipients; apportionment, allotment."). Significantly, the *Black's Law Dictionary* edition closest in time to the adoption of § 4B1.2(b)'s current form provided definitions of salient terms *particularized to the criminal drug law context*; in that sense, "a person 'distributes' a dangerous drug when he sells, transfers, gives or *delivers* to another . . . ." BLACK'S LAW DICTIONARY 475 (6th ed. 1990) (emphasis added). "In the context of illegal transfer of drugs, 'deliver'

13

means the actual, constructive, or *attempted transfer* from one person to another of a controlled substance." *See* BLACK'S LAW DICTIONARY 429 (6th ed. 1990) (emphasis added); *see also* BLACK'S LAW DICTIONARY (5th ed. 1981) (same).

We find the authority of the *Black's Law Dictionary* persuasive here, as it provides definitions of the salient terms in the precise, relevant context, and "context is everything in interpretation. One can't take the broadest (or for that matter narrowest) lay definition and simply affix it to the statute." *Gresham*, 938 F.3d at 849. As we shall see, those definitions reflect consistent legal usages at the time of the Guideline's adoption, *see infra* pp. 24–36, and they are consistent with the OED's broader lay definitions.

Applying those contextualized dictionary definitions then, the ordinary meaning of drug "distribution" plainly includes the "attempted transfer" of drugs, by way of the meaning of "delivery". The fact that Pennsylvania drug trafficking law mirrors these linguistic relationships is a facially compelling reason to find it comports with the Guidelines.

Simple examples of ordinary usage confirm the raw dictionary analysis. Consider a drug dealer who apportions his 'stash' into labeled packages, drives them to the local Post Office, and mails them out to buyers. Even if the packages are soon intercepted by Postal Inspectors, the dealer has already "distributed" the packages—by mailing them, he has "attempted transfer" to the buyers. Or, take a mid-level drug captain who places allotments of drugs at pre-arranged locations for collection by street-level dealers. He has "distributed" the drugs, even if the Police discover the parcels

14

before the transferee dealers do—again, a person can engage in drug "distribution" by attempting to transfer drugs. Likewise, when Police conduct a "buy-bust" operation in which a dealer is arrested before the drugs are finally handed over, the dealer engaged in the "distribution" of those drugs by attempting to transfer them.[8]

---

[8] Dawson insists that examples such as these describe only "actual" rather than "attempted" transfers, as "we don't focus on[:][D]id the receiver actually take [the items] into his possession[?]" in ordinarily evaluating whether such a transfer was completed or not. Oral Arg. Tr. at 15–16. We disagree. "Transfer" means "[t]o convey or remove from one place, person, etc., to another; pass or hand over from one to another; specifically, to change over the possession or control of . . . ." BLACK'S LAW DICTIONARY 1497 (6th ed. 1990). Each of these senses supports the view that our focus remains receiver-relative in discussing the distribution and transfer of drugs, the applicable linguistic context. *See Gresham v. Meden*, 938 F.3d 847, 849 (6th Cir. 2019) ("[C]ontext is everything in interpretation."). First, we do not say that the dealer caught in a buy-bust has "distributed" drugs just because he has "remove[d]" them to the *location* of the deal. Rather, we care about the fact that he has arrived there to "convey" the drugs to another "person". If the deal is interrupted, then our use of "distribution" to describe the situation grasps onto the abortive inter-personal transfer, that is, the attempt aspect. Second, the "pass or hand over" and "change over" senses clearly focus our attention on the attempt aspect as well; if the buy-bust dealer tries but fails to "hand over" the drugs, then he has "attempted" to transfer them without completing an "actual" transfer. Finally, the specific drug trafficking definitions found in

15

Dawson presents counter-hypotheticals showing that we sometimes use "distribute" in the narrow sense of a *completed* transfer. *See* Appellant's Reply Br. at 3. But these miss the point. What he needs to make out is the obverse: that there are "attempted transfers" which are *not* instances of "distribution". Only then would he show that § 780-113(a)(30) might reach beyond the scope of the Guideline. This Dawson fails to do. Indeed, he does not even address the fact that "distribution" and "delivery" have specific meanings when used in the drug trafficking context, meanings inconsistent with Dawson's narrow reading of the Guideline text.[9]

---

*Black's Law Dictionary* flatly refute Dawson's position that "distribution" refers only to "actual transfer".

[9] Because we conclude that the "attempted transfer" of controlled substances criminalized by § 780-113(a)(30) does not "authorize the state government to [prosecute] broader conduct" than is included in the federal definition, we need not inquire whether there is a "realistic probability" that the Commonwealth would prosecute such conduct. *See Salmoran v. Att'y Gen. United States*, 909 F.3d 73, 82 (3d Cir. 2018); *Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018) ("The requirement that a defendant show a realistic probability that the State would apply its statute to conduct that falls outside the generic definition of a crime operates as a backstop when a statute has indeterminate reach, and where minimum conduct analysis invites improbable hypotheticals." (internal quotation marks omitted)).

16

3.

The Government also urges that the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, provides significant guidance for interpreting the meaning of "distribution".  *Cf. Boumediene v. Bush*, 553 U.S. 723, 776 (2008) ("When interpreting a statute, we examine related provisions in other parts of the U.S. Code.").  We agree.

The relevant definitions in the CSA track those in *Black's Law Dictionary* and map directly onto § 4B1.2(b) and § 780-113(a)(30).  The CSA defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."  21 U.S.C. § 802(11).  It defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(8).  Reading § 4B1.2(b)'s use of "distribution" in light of these definitions, our ordinary language analysis would appear to be confirmed.  Although § 4B1.2(b) does not incorporate the CSA's conduct definitions by direct reference, there are several reasons why they nonetheless should inform our reading of the Guideline text.[10]

The CSA has defined "distribute" to include "attempted transfer" (by way of "delivery") since the time of its enactment in 1970; it did so when the term "distribution" was added to § 4B1.2(b) in 1989.  *See* U.S.S.G. App. C, Vol. I, at C. 138 (1989).  Generally, when similar language is used

---

[10] We take no position regarding the relationship between the term "controlled substance" in § 4B1.2(b) and the controlled substance schedules contained in the CSA.

17

in related statutes in functionally equivalent ways, we presume the same meaning applies.  *See M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017) (citing *Gomez-Perez v. Potter*, 553 U.S. 474, 481 (2008); *see also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.").  The noun and verb forms "distribution"/"distribute"—neither Party contends the formal difference matters—are used in functionally equivalent ways in the CSA and § 4B1.2(b): in the former, as a conduct prohibition; in the latter, to refer to convictions for violating that species of prohibition.  *See* 21 U.S.C. § 841(a)(1) (making it unlawful to "distribute" a controlled substance). Accordingly, our default assumption must be that the Commission—and, by implication, Congress—intended "distribution" to take the meaning long familiar from the CSA.[11]

---

[11] This assumption is bolstered when we consider that the Uniform Controlled Substances Act of 1970's identical definitions of "distribute" and "delivery" had been adopted in many states by 1989.  *See, e.g.*, Cal. Health & Safety Code §§ 11012, 11009; Del. Code Ann. tit. 16, §§ 4701(9), (13); N.J. Stat. Ann. § 2C:35-2; N.Y. Pub. Health Law §§ 3302(7), (10); Va. Code Ann. § 54.1-3401; *see also* Scott W. Parker, Note, *An Argument for Preserving the Agency Defense As Applied to Prosecutions for Unlawful Sale, Delivery, and Possession of Drugs*, 66 FORDHAM L. REV. 2649, 2691 (1998) (observing that not every state adopted the Uniform Act's criminalization of drug "delivery" but those that did generally followed the Act's definition).  Thus, the CSA's definitions would have been doubly ready-to-hand for the Guideline drafters, given their ubiquity in state criminal codes.

18

The history of § 4B1.2(b) also reveals that the Commissioners had the CSA in mind in defining the universe of crimes that would trigger the career offender enhancement. The Guideline's original version defined "controlled substance offense" as "an offense identified in 21 U.S.C. §§ 841 . . . of the Controlled Substance Act . . . and similar offenses." U.S.S.G. § 4B1.2(2) (1987). Then as now, 21 U.S.C. § 841 makes it illegal to "distribute" under § 802's definition of that term. Although the Commission revised § 4B1.2(b) in 1989 to replace specific statutory references with the current list of generic offense categories, this was not a *sub silentio* narrowing of the Guideline's scope. Rather, the Commission believed the new form provided "comparable but clearer definitions." *See Sentencing Guidelines for United States Courts*, 54 Fed. Reg. 9122, 9162 (Mar. 3, 1989). There is no reason to think that Congress had a different understanding of the 1989 amendment when it later took effect.

Congress's instructions in the Sentencing Reform Act of 1984 ("SRA"), Pub. L. 98-473, Title II, § 217(a), 98 Stat. 1837, 2021 (eff. Oct. 12, 1984), also support the view that the meaning of "distribution" in § 4B1.2(b) must be *at least as broad* as under the CSA. In the SRA, Congress ordered the Commission to design a career offender provision for the Guidelines as follows:

> (h) The Commission *shall assure* that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—

(1) has been convicted of a felony that is-

[. . .]

(B) an offense *described in section 401 of the Controlled Substances Act* (21 U.S.C. [§] 841) . . . and

(2) has previously been convicted of two or more prior felonies, each of which is—

[. . .]

(B) an offense *described in section 401 of the Controlled Substances Act* (21 U.S.C. [§] 841)[.]

28 U.S.C. § 994(h)(2)(B) (emphasis added). We have stated that the career offender Guideline "implements 28 U.S.C. § 994(h)[.]" *See United States v. Whyte*, 892 F.2d 1170, 1174 (3d Cir. 1989). And, as we explained above, § 841 proscribes distributing drugs via "attempted transfer". *See* 21 U.S.C. §§ 802(8) and (11); *United States v. Rowe*, 919 F.3d 752, 759 (3d Cir. 2019) (21 U.S.C. § 802 provides relevant definitions for terms in 21 U.S.C. § 841). Consequently, to hold that the Guideline excludes "attempted transfer" offenses would be inconsistent with our holding in *Whyte* that "predicate drug offenses" *include* those which "could have been prosecuted under 21 U.S.C. § 841," as "attempted transfer" can be so prosecuted. 892 F.2d at 1174; *see also United States v. Tobin*,

20

676 F.3d 1264, 1289 (11th Cir. 2012) (affirming conviction as instance of "attempted transfer").

Worse, it would mean embracing the absurd proposition that § 841—marked out by Congress as *the* paradigmatic controlled substance statute—is *not* categorically a controlled substance offense under the Guidelines. *See United States v. Booker*, 994 F.3d 591, 596 (6th Cir. 2021) ("It would be remarkable if [appellant] were right that § 841(a)(1) did not describe a 'controlled substance offense' under U.S.S.G. § 4B1.2(b)). In directing the Sentencing Commission to enact the career-offender Guidelines, Congress specifically instructed that 'offense[s] described in . . . 21 U.S.C. [§] 841' be covered."); *Garth*, 965 F.3d at 497 ("By this logic, federal distribution encompasses attempted distribution, so all 21 U.S.C. § 841(a) convictions for distribution and possession with intent to distribute (that is, most federal drug convictions) would fall outside the guidelines' definition of a controlled-substance offense. That can't be what the guidelines' drafters had in mind."); *United States v. Havis*, 929 F.3d 317, 320 (6th Cir. 2019) (Sutton, J., concurring in the denial of en banc reconsideration) ("I agree that it would be bizarre if violating the primary provision of the Controlled Substances Act turned out not to be a controlled substance offense."). That result would be contrary to Dawson's own implicit assumption before us that § 841 convictions can function as the *instant offense*, § 4B1.1(a)(2), triggering the career offender Guideline, *see* Appellant's Br. at 14–34 (arguing for reversal based only on § 4B1.1(a)(3)). Dawson's argument that "attempted transfer" crimes cannot serve as Guideline predicate offenses would prove too much, as the same definition of "controlled substance offense" applies to both § 4B1.1(a)(2) and § 4B1.1(a)(3). He thus argues for a rule that

21

would fly in the face of long-established, universal Circuit Court practice assuming the contrary.[12] Our law does not command such a bizarre result. *See Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute.").

The caselaw of our sister Circuits is also instructive in a more direct way, as three of them have held that "distribution" in § 4B1.2(b) has the same meaning as under the CSA. *See Thomas*, 969 F.3d at 584–85; *United States v. Madkins*, 866

---

[12] *See, e.g.*, *United States v. Murphy*, 998 F.3d 549, 555 (3d Cir. 2021); *United States v. Winter*, 22 F.3d 15, 17 (1st Cir. 1994); *United States v. Richardson*, 958 F.3d 151, 153 (2d Cir. 2020); *United States v. Womack*, 610 F.3d 427, 430 (7th Cir. 2010); *United States v. Brown*, 1 F.4th 617, 619 (8th Cir. 2021). Although § 841's role in the career offender calculus is usually as the *triggering* offense under § 4B1.1(a)(2), rather than as a *predicate* offense under § 4B1.1(a)(3), these categories are plainly identical. *See, e.g.*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning[.]"); *United States v. Piper*, 35 F.3d 611, 616 n.3 (1st Cir. 1994). Thus, Courts that have treated § 841 violations as career offender triggers— whether *sua sponte* or by invitation of the parties—have effectively assumed they must be predicate "controlled substance offenses" as well. *See, e.g.*, *United States v. Williams*, 898 F.3d 323, 333 (3d Cir. 2018); *United States v. Hinkle*, 832 F.3d 569, 571 (5th Cir. 2016); *Booker*, 994 F.3d at 596.

22

F.3d 1136, 1144 (10th Cir. 2017); *United States v. McKibbon*, 878 F.3d 967, 972 (10th Cir. 2017); *United States v. Smith*, 921 F.3d 708, 716 (7th Cir. 2019). The Sixth Circuit in particular has thoroughly analyzed this issue, concluding that the CSA can be "utilize[d] . . . in defining the relevant conduct covered by the Guidelines." *United States v. Jackson*, 995 F.3d 476, 481 (6th Cir. 2021); *see also Havis*, 929 F.3d at 319 (en banc) (Sutton, J., concurring in the denial of en banc reconsideration) ("Though [the Guidelines] do not define distribution, I see no reason to give the word . . . a different meaning from the one in the [CSA]."). The Tenth and Seventh Circuits have also held that Guidelines "distribution" should be understood according to the CSA's definitions. *See Madkins*, 866 F.3d at 1144; *McKibbon*, 878 F.3d at 972; *Smith*, 921 F.3d at 716.[13]

In sum, Dawson would have us hold that any statute criminalizing the "attempted transfer" of drugs will not trigger the career offender enhancement. Following him would require us to find that: the Commission has flouted Congress's clear command for more than three decades; the universal assumption of the Circuit Courts has been incorrect; and the clear holdings of three Circuits are misguided. This we will not do. All the authority points in the contrary direction: the Guidelines category of "distribution" offenses includes prohibitions on the "attempted transfer" of drugs, including § 841(a) and § 780-113(a)(30).

---

[13] The Second Circuit has also appeared to indicate its agreement, albeit in *dicta*. *See United States v. Savage*, 542 F.3d 959, 965 n.5 (2d Cir. 2008) (observing that a mere offer to sell drugs does not constitute distribution "as Guidelines § 4B1.2(b) *and* 21 U.S.C. § 802(11) define the term." (emphasis added)).

Resisting this conclusion, Dawson contends that we should ignore the CSA's definitions when interpreting the meaning of "distribution" in the Guidelines. He cites several out-of-Circuit cases, none of which is on-point. His citations to *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020) and *United States v. Ward*, 972 F.3d 364 (4th Cir. 2020) do him little good, as those cases addressed a distinct issue: how to interpret the term "controlled substance" in § 4B1.2(b)—does it refer only to drugs in the CSA schedules, or does it also reach state schedules? *See Ruth*, 966 F.3d at 652–53 (distinguishing the two issues). Neither side of that debate appears to doubt that the Guidelines cover *at least* those substances in the CSA schedules. *See, e.g.*, *id*. at 653–54. Here, we come to an analogous conclusion: the Guidelines cover "distribution" offenses at least to the extent those are defined under the CSA, which includes "attempted transfer".[14]

---

[14] Nor are we moved by the D.C. Circuit's analysis in *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018). There, the D.C. Circuit declined to add "attempted transfer" to the list of offense categories in § 4B1.2(b). *Id*. at 1091–92. It reasoned that the Sentencing Commission could have added such a category to § 4B1.2(b)—as they did elsewhere in the Guidelines—but chose not to, and § 4B1.2(b)'s list provides the exclusive definition of the term "controlled substance offense" in the Guidelines. *Id*. This reasoning has little bearing on the question before us, which concerns how to define a term—"distribution"—which is *already on the list* of § 4B1.2(b) offense categories and is *not* itself defined within the Guidelines. We do not alter the text of the Guideline, which was, in effect, the proposal facing the *Winstead* Court.

4.

Lastly, we consider the "purpose" behind, and policy of, the career offender Guidelines, *Nasir*, 17 F.4th at 471 (citing *Kisor*, 139 S. Ct. at 2415), which implement Congress's desire to impose "substantial prison terms" on "repeat drug traffickers," *Whyte*, 892 F.2d at 1174. Considering that objective, we strive to avoid rendering the enhancement inapplicable to convictions obtained under the drug trafficking laws of numerous states. *See Stokeling v. United States*, 139 S. Ct. 544, 552 (2019) ("Where . . . the applicability of a federal criminal statute requires a state conviction, we have repeatedly declined to construe the statute in a way that would render it inapplicable in many States."). Here, this principle militates against Dawson's position. Numerous states have adopted the CSA's definitions of "distribution" and "delivery" in codifying drug trafficking offenses. *See supra* n.11. Dawson asks us to hold that a conviction under any of those statutes is not categorically a "controlled substance offense" for career offender purposes. Plainly, the Government's contrary reasoning, "more so than [Dawson's], effectuates the purpose" of the career offender enhancement. *Whyte*, 892 F.2d at 1174. We discern no persuasive argument that would force us to neuter the Guideline.

\*\*\*

We will not undo the District Court's decision to designate Dawson a career offender. Although the enhancement was based on our now-defunct decision in *Hightower*, it was nonetheless correct, as our extensive analysis of the Guidelines text—without recourse to the Commentary—and state law has shown. In short, even after

25

*Nasir*, § 780-113(a)(30) remains a career offender predicate. Dawson's convictions under that statute justify his career offender status.[15]

B.

We turn now to Dawson's claim that the District Court failed to comply with Federal Rule of Criminal Procedure 32. We hold that Dawson failed to preserve this claim and he cannot meet his burden under plain error review.

As we explained, the District Court sentenced Dawson to 142 months' imprisonment, reflecting a 46-month downward variance from the bottom end of the Guidelines range. During a sealed sidebar conference early in the sentencing hearing, defense counsel reiterated his objection to the PSR's inclusion of L.B.'s fatal overdose, asking the Court to make a ruling *if* it intended to hold Dawson responsible. Back in open court, the District Court observed that defense counsel was concerned "about the Court taking into consideration, when imposing sentence, that the conduct of your client caused" L.B.'s death. Appx. at 223. The Court then overruled Dawson's objection, noting that the PSR did not claim Dawson caused L.B.'s death. The Court announced that

---

[15] In his Supplemental Brief, Dawson also raises—for the very first time—a new ground for reversal: that § 780-113(a)(30) is overbroad because it includes mere "offers to sell" drugs. *See* Appellant's Supp. Br. at 7-9 (citing a nonprecedential Superior Court decision reviewing for abuse of discretion). As this issue was raised for the first time in a Supplemental Brief, we decline to consider it. *See, e.g.*, *Alvin v. Suzuki*, 227 F.3d 107, 118 (3d Cir. 2000).

it would only decide on the causation issue—insofar as it transcended the PSR objection—should the Government press the point at the hearing. Defense counsel did not complain that the Court's ruling on the objection failed to dispose of the broader causation point. Neither did he object to the Court's announced intention to address that point *only* should the Government raise it.

Later in the hearing, defense counsel argued that the Court should vary downward because of the disparity between Dawson's sentencing exposure in state and federal court, noting that the case was adopted only after Dawson refused to plead guilty to the drug death count. The Court concluded, however, that this dimension of the case was irrelevant. The Government neither pursued nor withdrew the argument that Dawson caused L.B.'s death.[16] In explaining sentence, the Court made no reference to the drug death. After the imposition of sentence, defense counsel did not object to the District Court's failure to make a ruling regarding the overdose causation issue, telling the Court that there was nothing further that needed to be dealt with.

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that:

> (3) Court Determinations. At sentencing, the court:
>
> [. . .]

---

[16] The Government did announce that "we stated our position in our sentencing memorandum. We stand by it." Appx. 250.

27

> (B) must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]

The rule is "strictly enforced" and requires the district court to make express findings on disputed facts or to disclaim reliance thereon. *See United States v. Electrodyne Sys. Corp.*, 147 F.3d 250, 255 (3d Cir. 1998).

Dawson argues that the District Court disregarded its duty under Rule 32(i)(3)(B) by failing to rule on the "controverted" question of whether he caused L.B.'s death. Dawson maintains this objection was preserved at sentencing by: (1) Defense counsel's early requests for a ruling; and (2) Counsel's later statement that the overdose death should not be considered. We disagree.

> In *United States v. Flores-Mejia*, we held that:
> a defendant must raise any procedural objection to his sentence at the time the procedural error is made, i.e., when sentence is imposed without the court having given meaningful review to the objection. Until sentence is imposed, the error has not been committed. At the time that sentence is imposed, if the objection is made, the court has the opportunity to rectify any error by giving meaningful review to the argument.

759 F.3d 253, 256 (3d Cir. 2014) (en banc). This preservation rule allows for the rapid resolution of procedural errors, without the need for time-consuming appeals, and prevents "'sandbagging' of the court by a defendant who remains silent about his objection to the explanation of the sentence, only to belatedly raise the error on appeal if the case does not conclude in his favor." *Id*. at 257.[17]

The species of error at issue in *Flores-Mejia* was a district court's failure to rule on a defense request for a variance, which had been made in both its sentencing memorandum and was repeated at the sentencing hearing. *Id*. at 255. Our preservation analysis in that context is equally applicable in the Rule 32 context. *See United States v. Fishoff*, 949 F.3d 157, 163 n.12 (3d Cir. 2020) (applying *Flores-Mejia* analysis in Rule 32 context, finding post-imposition objection preserved claim of error); *see also United States v. Wagner-Dano*, 679 F.3d 83, 90 (2d Cir. 2012) ("We review only for plain error where, as here, an appellant asserts that the district court neglected to address an objection to the PSR in violation of Rule 32(i)(3)(B), but that appellant failed to alert the district

---

[17] Of course, the requirement of post-imposition objection does not apply to every error; we qualified in a footnote that: "A party may . . . make an objection to a procedural error at an earlier point as when, for example, a substantive request is denied and procedurally the defendant has objected to a lack of meaningful consideration of that request." *Flores-Mejia*, 759 F.3d at 255 n.1. However, merely arguing the district court should rule in your favor on an issue does not, alone, preserve a procedural objection to the court's ultimate failure to do so. *Id*. at 255 (defense counsel argued for variance but did not object to court's failure to rule on the matter).

court of this procedural issue after the district court made its findings or pronounced its sentence."); *United States v. Warren*, 737 F.3d 1278, 1284–85 (10th Cir. 2013) (plain error review appropriate where defendant does not "speak up and say the district court . . . violated Rule 32 or failed to properly resolve disputed facts").

In overruling Dawson's PSR objection—which had sought to excise those paragraphs discussing L.B.'s death—the Court said it would address the broader matter of causation if the Government should argue the point at the hearing. Dawson's counsel accepted this proposed procedure without complaint. The Government proceeded to ignore the causation argument, and the Court did not re-raise it *sua sponte*. Crucially, when the District Court made its findings and imposed sentence without ruling on Dawson's role in L.B.'s death, *defense counsel remained silent*. After sentence had been imposed, the Court asked if counsel had any outstanding issues that needed to be addressed, and defense counsel responded that *there were none*. Counsel did not alert the Court to any Rule 32 error; this objection was thus forfeited.

The Second Circuit faced a comparable scenario in *Wagner-Dano*, 679 F.3d at 83. There, Wagner-Dano lodged a variety of written objections to the PSR, which defense counsel pressed at the sentencing hearing. *Id*. at 87. The district court adopted the PSR in full, which effectively resolved some, but not all, of the objections. *Id*. at 90. The unresolved objections—which "did not directly dispute the facts as set forth in the PSR, but rather attempted to clarify Wagner-Dano's motives or provide context for the PSR's facts"—were not separately addressed by the Court at any point; defense counsel did not object to this omission. *Id*. On appeal,

30

Wagner-Dano argued that the Court had violated Rule 32(i)(3)(B). *Id*. The Second Circuit held that review would be for plain error because Wagner-Dano "failed to alert the district court of this procedural issue *after* the district court made its findings or pronounced its sentence." *Id*. (emphasis added). The Circuit explained that substantive argument on a point is not sufficient to preserve a related procedural objection, at least where the issue implicated is simple and familiar. *Id*. at 90–92 (citing *United States v. Villafuerte*, 502 F.3d 204 (2d Cir. 2007)). As compliance with Rule 32 is "neither novel nor complex," the parties must bring any such claim of procedural error to the district court's attention to avoid forfeiture. *Id.* at 91–92.[18]

We find the Second Circuit's analysis to be relevant and persuasive. Here too, the District Court appears to have disposed of Dawson's argument only in part, overruling the narrow PSR objection without addressing the broader causation point lurking behind it. But, if Dawson believed this to be error, then he had to bring it to the Court's attention.[19] His substantive argument that L.B.'s death should not play a role and early requests for a ruling "if the Court is going to rely

---

[18] The Second Circuit also echoed our own rationale in *Flores-Mejia*, explaining that requiring timely and specific objection to Rule 32 error facilitates rapid judicial correction of any problem, avoiding the delay and expense of appeals. *See Wagner-Dano*, 679 F.3d at 91.

[19] Instead, counsel acceded to the District Court's decisions to: (1) construe the PSR objection narrowly; and (2) rule on the larger causation point only if the Government chose to argue it at the hearing.

31

on [the death] as a factor in setting sentence" did not preserve the objection. Appx. 265. As the Second Circuit found, *substantive* argument will not preserve a *procedural* objection to the manner of the substantive point's resolution (or lack thereof). And Dawson's requests for a ruling were, at a minimum, too premature to preserve an objection, as no error had been committed at that time. *See Flores-Mejia*, 759 F.3d at 255 n.1 (counsel must object to a procedural error when it becomes "evident")[20].

In sum, if Dawson wanted to preserve a Rule 32(i)(3)(B) objection, then he should have spoken up when that error was allegedly consummated by the District Court's imposition of sentence without full resolution of the causation issue. His

---

[20] By contrast, *Fishoff*, 949 F.3d 157, illustrates proper preservation practice. There, the appellant argued that the district court had violated Rule 32(i)(3)(B) by failing to rule on an affirmative defense put forward in his sentencing memorandum. *Id.* at 163. At the sentencing hearing, the Court asked if the parties had any non-Guidelines objections to the PSR and, after defense counsel sought clarification as to whether this included his affirmative defense, the Court announced that it would hear argument regarding that issue "separate[ly]." *Id.* at 161–62. However, the Court proceeded to calculate and impose sentence without mentioning the issue again, drawing an objection from defense counsel "remind[ing] the court that it had not addressed" the affirmative defense. *Id.* at 162. We found that this post-imposition objection preserved the Rule 32 issue. *Id.* at 163 n.12 (contrasting counsel's failure in *Flores-Mejia* to raise such a post-imposition objection).

failure to do so means that our standard of review is for plain error.

Reviewing for plain error then, we find no cause to disturb Dawson's sentence. He "has 'the burden of establishing entitlement to relief for plain error.'" *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). An error is plain if it is "clear" or "obvious," "affects substantial rights," and "affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Dragon*, 471 F.3d 501, 505 (3d Cir. 2006) (quoting *United States v. Olano*, 507 U.S. 725, 732–34 (1993)); Fed. R. Crim. P. 52. An error "affects substantial rights when it is prejudicial," that is, when it "affected the outcome of the district court proceedings." *Id.* (quoting *Olano*, 507 U.S. at 734); *see also United States v. Payano*, 930 F.3d 186, 192 (3d Cir. 2019) (defendant must show "reasonable probability" that result would have been different but for the claimed error).

Even assuming *arguendo* that the District Court's omission was clear error, Dawson cannot show that it affected his substantial rights. There is no indication in the record that the District Court held Dawson responsible for L.B.'s death. To the contrary, there is ample reason to believe that the District Court did *not* take the death into account. The District Court granted a substantial downward variance, imposing a sentence 46 months below the bottom end of Dawson's Guideline range. That immediately suggests the Court did not hold Dawson responsible for an uncharged *homicide* offense— let alone one that the Court never mentioned in explaining the basis for the sentence selected. This silence makes perfect sense in light of the Court's announced intention to hold

33

Dawson responsible for L.B.'s death only *if* the Government were to argue the matter at the hearing *and* manage to convince the Court on the point. The best reading of the record is that the Court was true to its word: the Government did not press the causation point, so it did not impact sentence.

Moreover, the Court was explicit regarding what factors *did* influence the sentence. It explained that Dawson's case was no "exception" to its general policy to "factor mercy into [its] sentences when possible." Appx. 256–57. And, in reviewing the § 3553(a) factors, the Court paid special attention to "protect[ing] society from potential harm, an inference that can easily be drawn from the defendant's five convictions that he does pose some danger to society, specifically returning to dealing in serious drugs when the going gets tough, as he has done in the past." Appx. 259. There is not even a hint that the District Court believed Dawson caused L.B.'s death, choosing not to elaborate on the "seriousness of the defendant's conduct." Appx. 259.

Dawson draws our attention to the District Court's self-described "struggl[e]" to justify an even greater variance, Appx. 256, asking us to take this as proof that the Court was reluctant to vary further only because it *was* considering L.B.'s death. Dawson believes that he made very persuasive arguments below which, absent consideration of the drug death, would have generated a greater variance. *See* Appellant's Br. at 52–57. To the contrary, the record shows that the District Court was reluctant to vary precisely because it *rejected* the Defense's arguments:

> We've been in session almost three hours during this proceeding, and I've heard a lot emanating

from the defense, but I'm not really hearing any very persuasive arguments for a significant variance from the guidelines.

Appx. 256. The Court was unmoved by the circumstances which resulted in federal adoption of Dawson's case, deeming them irrelevant. It similarly rejected Dawson's family circumstances as inadequate to justify a larger variance. The Court had only its general inclination towards "mercy" to fall back on. Appx. 256–57.

In sum, Dawson has failed to meet his burden of showing a realistic probability that his substantial rights were adversely affected by any Rule 32 omission. The record does not support a reasonable probability that the District Court silently held Dawson responsible for L.B.'s death. There is thus no Rule 32 ground upon which to disturb Dawson's sentence.

## V.

Because Dawson was properly labeled a 'career offender' under the Guidelines and any Rule 32 error did not affect his substantial rights, we will affirm the District Court's judgment.